STATE OF NORTH CAROLINA v. EDWARD MARTIN McKENNA

No. 22

(Filed 14 May 1976)

1. **Constitutional Law § 31— failure to serve arrest warrant on defendant — requirements of due process satisfied**

   The usual and better practice is to serve defendant promptly with an arrest warrant, but such service is not a constitutional requirement of due process; rather, due process is satisfied if defendant is adequately notified of the charge against him, is permitted to confront his accusers and witnesses with other testimony, has assistance of counsel, and is afforded adequate time to prepare and present his defense. Defendant in this case, who was never served with an arrest warrant, was afforded all of these safeguards.

2. **Jury § 7— juror accepted by State and tendered to defendant — subsequent challenge by State — discretionary matter for trial court**

   Nothing in G.S. 9-21(b) prohibits the trial court, in the exercise of its discretion before the jury is empaneled, from allowing the State to challenge *peremptorily or for cause* a prospective juror previously accepted by the State and tendered to defendant.

3. **Jury § 7— juror passed by State and tendered to defendant — subsequent peremptory challenge by State — discretionary matter for trial court**

   That portion of *State v. Fuller,* 114 N.C. 885, which holds that the trial judge may not, in the exercise of his discretionary and supervisory powers to insure an impartial jury, permit the district attorney to challenge peremptorily a prospective juror after the juror has been passed by the State and tendered to the defendant is overruled.

4. **Jury § 7— jurors chosen but not empaneled — expression of opinion by juror — peremptory challenge proper**

   Defendant was not prejudiced where, after twelve jurors had been accepted by both the State and the defendant, one juror stated to another, "I hope they acquit him," and the court thereafter allowed the State to exercise one of its remaining peremptory challenges to excuse the juror who had made the statement.

5. **Homicide § 20— photographs of victim and crime scene — admissibility for illustration**

   The trial court in a first degree murder prosecution did not err in allowing into evidence two photographs portraying the condition and location of the victim's body at the scene of the killing for the purpose of illustrating the testimony of a witness.

6. **Homicide § 20; Criminal Law § 84— search of defendant's home — alleged weapon found — admissibility**

   The trial court in a first degree murder prosecution properly allowed into evidence the alleged murder weapon which was seized

during a search of defendant's home, since the evidence on *voir dire* tended to show that the officers who searched defendant's home had probable cause to believe that it contained firearms in violation of federal and state laws and thus subject to seizure under a lawful search warrant, the search warrants obtained by those officers were not based upon information secured by another police officer when he went into defendant's home purportedly at defendant's invitation, as both warrants were issued prior to that officer's entry, and the trial court concluded that the weapon was lawfully seized and was not the fruit of any official illegality.

7. **Homicide § 21— first degree murder — sufficiency of evidence**

Evidence was sufficient for the jury in a first degree murder prosecution where it tended to show that defendant and a companion broke into the victim's home and ransacked it, defendant shot the victim with a pistol which he found in the home, the pistol was subsequently found in defendant's home, and defendant had stated to a neighbor that he had killed a cop in Raleigh.

8. **Criminal Law § 86— testifying defendant — cross-examination for impeachment**

A defendant who elects to testify in his own behalf surrenders his privilege against self-incrimination and knows he is subject to impeachment by questions relating to specific acts of criminal and degrading conduct, and such cross-examination for impeachment purposes is not limited to conviction of crimes but encompasses any act of the witness which tends to impeach his character.

9. **Criminal Law § 86— prior criminal misconduct — cross-examination of defendant — arrest warrants held by district attorney in jury's view**

The trial court did not err in permitting the district attorney to cross-examine defendant concerning unrelated criminal conduct and to hold arrest warrants in his hand in view of the jury while doing so, since the jury did not know what the papers were, and holding them up during cross-examination had little, if any, impact on the jury.

10. **Criminal Law § 102— jury argument that witnesses were liars — impropriety not prejudicial**

When improper argument is made to the jury, it is the duty of opposing counsel to make timely objection so the judge may correct the transgression by instructing the jury, but such rule does not apply in a capital case if the argument is so grossly improper that removal of its prejudicial effect, after a curative instruction, remains in doubt. The district attorney's argument in this first degree murder case that the defendant was a liar, though improper, was not so prejudicial to defendant as to require a new trial.

11. **Criminal Law § 73; Constitutional Law § 31— affidavit supporting search warrant — admission proper**

In a first degree murder prosecution the introduction of affidavits upon which search warrants were obtained was not prejudicial error, since the affidavits were received into evidence without objection, both affiants took the witness stand and submitted themselves to cross-

examination, and defendant himself testified to some of the matters contained in the affidavits.

**12. Criminal Law § 127— arrest of judgment**

Judgment may be arrested in a criminal prosecution when, and only when, some fatal error or defect appears on the face of the record proper.

**13. Criminal Law § 132— motion to set aside verdict**

Motions to set aside the verdict and for a new trial are addressed to the sound discretion of the trial court and, absent abuse of discretion, refusal to grant them is not reviewable.

**14. Criminal Law § 128— mistrial in capital cases**

In capital cases the court may order a mistrial without the consent of the accused only in cases of necessity to attain the ends of justice and must find the facts and place them in the record to the end that the court's action may be reviewed on appeal.

DEFENDANT appeals from judgment of *Clark, J.,* 7 July 1975 Regular Criminal Session, WAKE Superior Court.

Defendant, represented by court-appointed counsel, was tried upon a bill of indictment, proper in form, charging him with the first degree murder of William Blaney Holland, Jr., on 10 November 1973 in Wake County.

The State's evidence tends to show that William B. Holland, Jr., was a member of the Raleigh Police Department. When he failed to report for duty at 4 p.m. on 10 November 1973, Officer Arrington went to Mr. Holland's home at approximately 6 p.m. to check on him. He knocked on the door but received no answer. About that time Mrs. Holland and her young daughter arrived. They had spent the night of November 9 with Mrs. Holland's parents. She unlocked the door and they found the dead body of Officer Holland in one of the bedrooms. He had been shot.

The den door leading to the outside was open and broken glass from the door itself was on the floor. Subsequent investigation showed that a .38 caliber handgun, normally kept in a dresser drawer in the back bedroom, was missing. The gun was a private weapon owned by Mr. Holland in addition to his service revolver. There was a pool of blood on the carpet and numerous bullet holes in the walls. A pillowcase full of items was found on a double bed in the rear bedroom. The pillowcase contained, among other things, a container of chemical mace which had been issued to Officer Holland, a military police nightstick, an electric clock that had stopped at 1:59, a movie camera and

a movie projector. It was determined that all of these items belonged to Mr. Holland. Various dresser drawers were standing open, and there was much evidence that the house had been ransacked.

Four bullets were recovered and offered in evidence at the trial. State's Exhibit 21 was the bullet Dr. Kaasa removed from the head of William B. Holland, Jr.

James Charles Pittman testified as a witness for the State. He said he was seventeen years of age on 10 November 1973. On Friday evening, 9 November 1973, he saw defendant McKenna at a gas station in Bladenboro and, at defendant's request, drove him to Raleigh. Defendant told him where to go, and they drove to a new housing project. They walked down a road to a house with a light burning in the yard, went under the carport and rang the doorbell four or five times, but received no answer. They walked to the rear of the house, defendant knocked the window glass out of the back door, and they went inside. Pittman said he saw defendant "pulling out things and putting them in a pillowcase." The time was about 1:30 a.m. on the morning of November 10. After they had been in the house a short time, Pittman heard a gun go off and jumped into a closet. Defendant "had a .38 stuck in his belt and then he started shooting with it. He shot the gun twice I believe. The .38 must have come from the bedroom because I didn't see him with it prior to going in. He had it when he came out of the bedroom."

Shortly after the shots were fired, defendant went to the closet where Pittman was hiding and they both ran out of the house. As they passed the door to bedroom number one, Pittman "saw the shadows of two feet. They were right close to the doorway of the bedroom. I could not see any of the rest of the body attached to those feet. The feet were not moving in any way. We ran out of the back door of the house."

Pittman said they reentered his car and drove toward Bladenboro. Upon arrival they went to defendant's home and defendant told his wife they had a shooting. The following day defendant told Pittman that he "better not ever say anything about what happened. He said he'd kill me if I told what happened. I believed him and I didn't say anything about it until April 20th of this year. On April 20th I made a statement to Mr. Benson and Mr. Gaskins. That's John Gaskins with the

SBI and Freddie Benson with the Wake County Sheriff's Department. And I also took them out and showed them that house that I testified about in connection with State's Exhibit 22 there. . . . State's Exhibit 22, a photograph, is an accurate illustration of the home and subdivision I testified we went to and also of the home that I identified to the officers." He said State's Exhibit 23, which is a pistol and holster, looked like the gun defendant used in the shooting.

The witness Pittman further testified that he had a plea bargaining arrangement with the State whereby he had agreed to testify truthfully in this case and the State had agreed to permit him to plead guilty to accessory after the fact to murder and receive a ten-year active prison sentence.

When the State sought to offer in evidence the .38 caliber pistol marked State's Exhibit 23, defendant objected, moved to suppress, and requested a voir dire.

Kenneth D. Brady, a treasury agent with the Bureau of Alcohol, Tobacco and Firearms, testified on voir dire that he went to defendant's home on 26 March 1975, accompanied by defendant who was then in custody charged with violation of the United States Gun Control Act of 1968. Mr. Brady had both an arrest warrant and a search warrant which authorized a search of defendant's premises for evidence of violation of the Federal Gun Control Act. He was also accompanied by SBI Agent Marshal Evans who had a state search warrant. Both search warrants were read to defendant McKenna when the agents arrived at his home. The officers then entered defendant's home and, pursuant to the search warrants, searched for and seized every firearm and all ammunition on the premises. Among the items seized was State's Exhibit No. 23, which was found in the top drawer of the dresser next to the bed in the master bedroom of defendant's home. None of the agents, state or federal, who participated in this search and seizure had ever searched defendant's home prior to the execution of these search warrants, although, on some prior occasion, SBI Agent Wesley Terry had told Kenneth D. Brady that he had been to defendant's residence and had seen a number of weapons there. Agent Brady testified that Agent Terry did not inform him of the location of State's Exhibit 23 and that he had no prior knowledge that the weapon was in the dresser drawer. Agent Brady also stated that he had no knowledge that any of the items

State v. McKenna

seized from defendant's home were connected with any murder case.

Marshal Evans, Special Agent with the SBI, testified on voir dire that he was present with Agent Brady during the search of defendant's home; that he had a search warrant (State's Exhibit 25) which was issued upon an affidavit to which he had sworn; that he read the warrant to defendant prior to entering defendant's home and prior to the time Agent Brady entered the home. Agent Evans said he was not present when Brady found the .38 pistol marked State's Exhibit 23, and that insofar as he knew, neither he nor anyone else had previously informed Agent Brady of the location of the weapon. He also stated that he had no idea whether Agent Terry was or had been in the house prior to the time the search warrant was executed.

The State also introduced on voir dire Exhibits 24 and 25, the search warrants executed by Agents Brady and Evans, and the sworn affidavits used to obtain them. Exhibit 24 indicates that the affiant swore to the affidavit, and the warrant was issued, on 25 March 1975. Exhibit 25 indicates that the affiant swore to the affidavit, and the warrant was issued, at 8:30 a.m. on 26 March 1975.

Defendant called Agent Wesley P. Terry and he testified on voir dire that he was an investigator with the Bladen County Sheriff's Department. On 26 March 1975 he went to defendant's home and entered the house by invitation from defendant. He said defendant told him on the telephone at approximately 10 p.m. on 25 March 1975 to meet him at his house; that when he arrived defendant was not there but a next door neighbor named Nelson Fipps advised him that defendant "had left word with him to tell me if he was not home when I arrived to go in and wait." Accordingly, Mr. Terry entered defendant's home, where he found a crying baby. Once inside, he went to a rear bedroom in the dwelling and looked in a top dresser drawer, immediately adjacent to the bed, for a certain firearm which he had previously seen in the trailer. "It was not my purpose, when I went in the house at that time on March 26, to seize anything, and I did not, in fact, seize anything. Nor did I inform on that day when I came out any of the evidence involved, either State or Federal agents, as to the exact location of any items in the house. I had previously given them information about firearms, a briefing that morning. . . . The only reason

State v. McKenna

I was checking to see if that weapon was in the dresser beside the bed, was so I could warn my fellow officers outside. I recorded the serial number as a matter of course when I examined the weapon."

Nelson B. Fipps testified on voir dire that he lived next door to defendant and recalled seeing Agent Wesley Terry on March 26. He said defendant's wife came to his house and told him to tell Wesley Terry "to stay there" and that's what he told him. "Terry came over and I told him that Judy had said to wait there. I did not tell him to go inside and wait. I didn't say anything about inside. I just said Judy and Ed said wait over there. . . . I never gave him permission to go inside the McKenna house. I told him he could go in and get the young'un because I wasn't going to get him. I did not tell him that the McKennas had told him to go inside the house."

Defendant testified on voir dire that when he talked to Wesley Terry on March 25 he did not give him permission to enter his home. He said he agreed to meet Terry who wanted defendant to go to South Carolina with him. On March 26 he left home on a mission concerning the title to his truck and asked Wanda Fipps if she would tell Wesley to wait. "I did not say wait in the house, but just to wait until I got back. I thought I'd only be gone a few minutes."

Defendant further testified that Agent Brady did not read a search warrant before entering the house but only said he had one. Nor did Agent Marshal Evans read a search warrant.

The court made findings of fact substantially in accord with the voir dire testimony of Agent Brady, Agent Evans, and Officer Wesley P. Terry. Based on those findings the court concluded, among other things, that Agents Brady and Evans had probable cause to believe that defendant's premises contained firearms in violation of federal and state laws and thus subject to seizure under a lawful search warrant; that the search warrants were not based upon information obtained by Officer Terry upon his entry into the defendant's premises on March 26, 1975, but both warrants were issued prior to such entry; that the weapon identified as State's Exhibit 23 was lawfully seized by Agent Brady and said weapon is not the fruit of any official illegality. Defendant's objection and motion to suppress was thereupon denied.

The jury returned to the courtroom and the weapon was admitted into evidence. The witnesses Brady, Evans, Terry and Nelson B. Fipps returned to the witness stand and each testified before the jury to substantially the same facts he had stated on the voir dire. The witness Fipps further testified that sometime in October, November or December of 1974, defendant told him that he had killed a cop in Raleigh and that Charles Pittman was with him. "He told me he shot the cop right between the eyes with a .38. He said Dooley [Charles Pittman] was in the closet, said shooting at him with a .22 and he ran out of bullets and he said Dooley wouldn't shoot it, so he got to the closet where Dooley was and he got the gun. He didn't say how he got it or where he got it. He said he saw an opening—he was standing by door facing and he shot him right between the eyes."

Dr. Laurin J. Kaasa, a specialist in pathology, performed an autopsy on the body of William B. Holland, Jr., on 10 November 1973 and removed a lead bullet which was lodged behind the right ear just beneath the skin. The bullet had penetrated the skull. Dr. Kaasa testified that Mr. Holland died as a result of hemorrhage and laceration of the brain caused by the bullet.

Clarence Walter Wooten testified that he was employed at Hill's, Inc., a sporting goods store in Raleigh. On 9 April 1971 he sold William B. Holland, Jr., a Colt Detective Special, 2-inch barrel, .38 special, serial number B-10651. The same serial number is on the gun marked State's Exhibit 23 which was taken from defendant's home by Agent Brady. Mr. Wooten said his firm was required to keep records of all firearms sales and produced his business records showing the sale to William B. Holland, Jr., and the date it was purchased. These records were offered in evidence as State's Exhibits 27 and 28.

SBI Agent Johnny Gaskins testified that he interviewed James Charles Pittman on 20 April 1975 with reference to Officer Holland's murder. Pittman first denied any knowledge of the murder and was placed in jail. A few hours later he sent for Agent Gaskins and Wake County Deputy F. L. Benson. These officers advised Pittman of his constitutional rights following which Pittman stated that he had in fact been involved in this particular murder. He then made a statement to these officers which was substantially in accord with his testimony at trial. The officers drove through the subdivision where Officer Holland's home is located and Pittman pointed out the

house that he and defendant had entered. He said McKenna had shot at least twice and he then heard somebody fall. The shooting occurred, according to Pittman, between 1 and 2 a.m.

Defendant testified in his own behalf and offered other witnesses as well.

Carol Hardin testified that she was secretary and bookkeeper for Cole Advertising and kept the payroll records; that defendant was also employed there and the records show that defendant worked on Friday, 9 November 1973 from 7:55 until 3:25 and on Saturday, 10 November 1973, from 10:00 until 5:20. She said a gas ticket indicated that defendant got gas and signed the ticket on 9 November. On recross examination she said: "There is nothing to show by the clock or this gas ticket or anything else that Mr. McKenna was at work between 3:25 Friday, the 9th, and 5:20 p.m. Saturday, the 10th."

Sheila Skipper testified that she attended a dance at the Red Barn in Chadbourn on Friday night, November 9, and saw defendant at the dance with his wife. She said she and her husband and defendant and his wife left the dance together between 11 p.m. and midnight, drove to defendant's home where they cooked and ate, after which she spent the night there. On cross-examination she said she didn't know whether it could have been November 16 or November 23. "It was the first weekend after Halloween. I reckon that would have been the second and third of November."

Frank Gore, a defense witness, testified that James Charles Pittman tried to sell him a pistol sometime in the summer of 1974.

Carson Skipper testified he saw a .38 pistol in a holster on the television set in McKenna's home and tried to buy it, but was told by defendant that the pistol belonged to Pittman, who had pawned it to him for $30.00.

Ronald C. McKeithan, defendant's neighbor, testified that in August 1974 he had a conversation with defendant concerning the purchase of a .38 caliber pistol and that defendant stated he had obtained one from James Charles Pittman.

Defendant testified as a witness in his own behalf. He stated that he was thirty years old and that his criminal record included the following: (1) At age sixteen, he was convicted in juvenile court in Michigan for running away from home,

stealing a car and breaking into a house. (2) He broke into a house at Carolina Beach, North Carolina, and stole some cigarettes. (3) He was convicted of stealing a Cadillac at Carolina Beach and was sentenced to three years in prison in May 1962 for that offense. (4) He escaped in October of 1962, stole a car in Virginia and went to Pennsylvania, where he was convicted of breaking into a house and sentenced to six years in prison. (5) After being paroled and sent back to North Carolina eighteen months later, he escaped from a prison camp in Asheboro, was captured and sent to a prison camp at Clinton, where he again escaped. He broke into a house in Bladenboro and stole a man's pants, wallet, car keys and car. He ran out of gas in Ohio, broke into another house there, stole another car and went to Michigan. He was not tried for any of these offenses. (6) In Michigan he was convicted of breaking and entering and car theft, for which he was sentenced to respective prison terms of five to ten years and two and one-half to five years.

Defendant further testified that he met James Charles Pittman in jail in Elizabethtown in 1971. He said he knew Pittman fairly well in November 1973 and bought "this gun" from him, agreeing that if he ever sold it he would let Pittman have it back. He testified he did not recall any dealings with Pittman on or about 9 November 1973; that he was not with Pittman and never went to Raleigh with him on that date. He denied that he ever entered the home of Officer Holland, said he had never been there, and swore he did not shoot him. He denied he ever told Nelson Fipps that he had shot and killed a policeman in Raleigh. He swore that SBI Agents Gaskins and Evans told him they were going to gas him and his wife and called him all kinds of names but that he made no statement concerning Mr. Holland's murder because he knew nothing about it. He admitted that on and before 26 March 1975 he was engaged in selling weapons unlawfully on a regular basis in North Carolina.

Following arguments of counsel and the charge of the court, the jury convicted defendant of murder in the first degree and he was sentenced to death. He appealed to this Court assigning errors discussed in the opinion.

*William B. Marshall, Jr., attorney for defendant appellant.*

*Rufus L. Edmisten, Attorney General; Edwin M. Speas, Jr., Special Deputy Attorney General; and William H. Guy, Associate Attorney, for the State of North Carolina.*

HUSKINS, Justice.

[1]  Prior to arraignment defendant moved to dismiss the murder charge on the ground that, prior to trial, he had not been served with an arrest warrant, indictment, or other criminal process informing him of the particulars of the charge against him. After a voir dire hearing, the trial judge made findings of fact and concluded as a matter of law that defendant had shown no prejudicial denial of his constitutional rights. Denial of the motion to dismiss constitutes defendant's first assignment of error.

Defendant contends he was denied due process in that he was not adequately informed of the charge against him and thus was prejudiced in the preparation of his defense. For the reasons which follow, this contention is without merit.

Although defendant was never served with the warrant, the record indicates that a valid warrant was issued on 20 April 1975, a true bill was returned on 28 April 1975 charging defendant with murder, and defendant's own affidavit indicates he was given a copy of the murder indictment soon thereafter. Paragraph 8 of his affidavit reads: "That he was not informed of the Grand Jury proceedings nor given a copy of the murder indictment against him until over a week after the Grand Jury sat." Moreover, a capias *instanter* was served on defendant on 15 May 1975 informing him that he was under indictment for murder. Defendant was advised of the details of the charge by the officer who served the capias and also by his attorneys. He was arraigned and placed on trial on 7 July 1975. The record shows he had counsel at all times after 7 May 1975 and that no motion was ever made for a bill of particulars or for additional time within which to prepare his defense. These facts strongly suggest that defendant was sufficiently apprised of the charges against him and had adequate time to prepare his defense.

The usual practice, and the better practice in our view, is to serve defendant promptly with the arrest warrant. This would have informed him of the charges against him. Such service, however, is not a constitutional requirement of due process. Due process is satisfied if the defendant is adequately notified of the charge against him, is permitted to confront his accusers and witnesses with other testimony, has assistance of counsel, and is afforded adequate time to prepare and present

State v. McKenna

his defense. *See State v. Vick,* 287 N.C. 37, 213 S.E. 2d 335 (1975) ; *State v. Cradle,* 281 N.C. 198, 188 S.E. 2d 296, *cert. denied* 409 U.S. 1047, 34 L.Ed. 2d 499, 93 S.Ct. 537 (1972) ; *State v. Phillip,* 261 N.C. 263, 134 S.E. 2d 386 (1964) ; *State v. Lane,* 258 N.C. 349, 128 S.E. 2d 389 (1962) ; *State v. Barnes,* 253 N.C. 711, 117 S.E. 2d 849 (1961) ; *State v. Gibson,* 229 N.C. 497, 50 S.E. 2d 520 (1948). The record in this case indicates that defendant was afforded all of these safeguards. No prejudice has been shown by failure to serve the warrant. If defendant needed additional information concerning the charge against him, a bill of particulars, as authorized by former G.S. 15-143 (now G.S. 15A-925), would have provided it. *See State v. Cameron,* 283 N.C. 191, 195 S.E. 2d 481 (1973). This assignment is overruled.

Defendant's second assignment is not discussed in his brief and is therefore deemed abandoned. Rule 28, Rules of Appellate Procedure.

[4] After twelve jurors had been accepted by both the State and the defendant, but before the jury had been empaneled, it was brought to the attention of the presiding judge that Juror No. 7, Mrs. Ella Johnson, had stated to Juror No. 8, Mrs. Virginia Reynolds, "I hope they acquit him," in violation of the court's earlier instructions that the jurors should not discuss the case among themselves until they had heard all the evidence, the argument of counsel, the instructions of the court, and had retired to the jury room for the purpose of deliberating upon their verdict. The district attorney thereupon moved "that the court in its discretion permit the State to exercise one of its remaining peremptory challenges." The court, over objection, allowed the motion "in its discretion and in the interest of justice." Mrs. Johnson was then excused peremptorily by the State. An additional juror was questioned and passed by both the State and the defendant and the jury was empaneled. This ruling constitutes defendant's third assignment of error.

[2] G.S. 9-21 (b) provides in pertinent part that "[t]he State's challenge, peremptorily or for cause, must be made before the juror is tendered to the defendant." We have held, however, contrary to defendant's contention, that the statute does not deprive the trial judge of his power to closely regulate and supervise the selection of the jury to the end that both the defendant and the State may receive a fair trial before an impartial jury. *State v. Harris,* 283 N.C. 46, 194 S.E. 2d 796,

*cert. denied* 414 U.S. 850, 38 L.Ed. 2d 99, 94 S.Ct. 143 (1973). This view has been sustained in numerous cases, including *State v. Waddell,* 289 N.C. 19, 220 S.E. 2d 293 (1975) ; *State v. Wetmore,* 287 N.C. 344, 215 S.E. 2d 51 (1975) ; and *State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971), *death sentence vacated,* 408 U.S. 939, 33 L.Ed. 2d 761, 92 S.Ct. 2873 (1972). We are persuaded anew that our holding on this point in *State v. Harris, supra,* is sound. Nothing in G.S. 9-21(b) prohibits the trial court, in the exercise of its discretion before the jury is empaneled, from allowing the State to challenge *peremptorily or for cause* a prospective juror previously accepted by the State and tendered to the defendant. "[I]t is the duty of the trial judge to see that a competent, fair and impartial jury is empaneled, and to that end the judge may, in his discretion, excuse a prospective juror even without challenge from either party. Decisions as to a juror's competency at the time of selection and his continued competency to serve are matters resting in the trial judge's sound discretion and are not subject to review unless accompanied by some imputed error of law." *State v. Waddell, supra.*

We are not inadvertent to the decision of this Court in *State v. Fuller,* 114 N.C. 885, 19 S.E. 797 (1894). In that case defendant was charged with murder. A prospective juror was passed by the State and the defendant, but before he was sworn the juror asked to be excused because of a long friendship with the defendant who was also related to him by marriage. The trial judge ruled there was no ground for challenge for cause but permitted the State to challenge the juror peremptorily. This Court, holding this to be error, stated:

> "The discretionary power of the judge was confined to challenges for cause. He had no more authority to extend the time for making peremptory challenges beyond the limit fixed by the statute than he had to increase the number allowed to the State beyond four. The question of the proper interpretation of the language of the statute is one for this Court, and its meaning seems so plain as to require but little further discussion of this exception. . . ."

[3] In *State v. Harris, supra,* we distinguished *Fuller* on the ground that the challenge in *Fuller* was peremptory whereas in *Harris* the juror was challenged for cause. Justice Branch, however, writing for the Court in *Harris,* said:

"If the present case and *Fuller* were not distinguishable, and *Fuller* was interpreted to hold that under a statute similar to G.S. 9-21(b) the trial judge was divested of his supervisory and discretionary powers to insure the selection of a fair, competent and impartial jury, we would be compelled by the forces of better reasoning and the overwhelming weight of authority to overrule that portion of *Fuller* so holding."

Following this intimation in *Harris,* we held in *State v. Wetmore, supra,* that the trial court did not abuse its discretion in allowing the district attorney to reexamine two prospective jurors after both had been passed by the State and the defendant *and excuse one for cause and the other peremptorily.* Thus we no longer regard as authoritative that portion of *Fuller* which holds that the trial judge may not, in the exercise of his discretionary and supervisory powers to insure an impartial jury, permit the district attorney to challenge peremptorily a prospective juror after the juror has been passed by the State and tendered to the defendant. *State v. Fuller, supra,* insofar as it is inconsistent with the views expressed in this opinion, is overruled.

[4] Defendant suffered no prejudice when the State was permitted to challenge Mrs. Johnson peremptorily. He is not entitled to a jury of his choice and has no vested right to any particular juror. So long as the jurors who are actually empaneled are competent and qualified to serve, defendant may not complain; and this is particularly true where, as here, defendant fails to exhaust his peremptory challenges. *See State v. Bernard,* 288 N.C. 321, 218 S.E. 2d 327 (1975). This assignment of error is overruled.

[5] Two photographs, State's Exhibits 2 and 5, portraying the condition and location of the victim's body at the scene of the killing, were admitted into evidence over objection. Defendant contends that the scenes depicted are basically identical to those shown by other photographs and exhibits offered by the State. He argues that the limited probative value for illustrative purposes of State's Exhibits 2 and 5 was far outweighed by their inflammatory and prejudicial effect upon the jury. Admission of these photographs constitutes the basis for defendant's fourth assignment of error.

Photographs of the scene of a homicide are competent in this jurisdiction for the purpose of illustrating the testimony

of a witness. *State v. Atkinson,* 278 N.C. 168, 179 S.E. 2d 410, *death sentence vacated* 403 U.S. 948, 29 L.Ed. 2d 861, 91 S.Ct. 2292 (1971); *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824 (1948); 1 Stansbury's North Carolina Evidence § 34 (Brandis rev. 1973). It is proper in the prosecution of a homicide to admit sufficiently authenticated photographs used by a State's witness to illustrate his testimony relating to the position and appearance of the body of the deceased even though the scenes portrayed are repulsive and unpleasant. If a photograph is relevant and material the fact it is gory or gruesome, and thus may tend to arouse prejudice, will not alone render it inadmissible. *See State v. Patterson,* 288 N.C. 553, 220 S.E. 2d 600 (1975); *State v. Boyd,* 287 N.C. 131, 214 S.E. 2d 14 (1975); *State v. Duncan,* 282 N.C. 412, 193 S.E. 2d 65 (1972); *State v. Barrow,* 276 N.C. 381, 172 S.E. 2d 512 (1970).

State's Exhibits 2 and 5 were properly authenticated by Detective Arrington who testified that they accurately depicted and portrayed the condition and location of the torso and full body of the deceased as he observed it on arrival at the scene of the killing. These photographs were therefore competent to illustrate the testimony of Detective Arrington. Whether one or both should have been admitted was in the discretion of the court. *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328 (1969). We hold that the use of these two photographs was not excessive, unnecessarily duplicative, or inflammatory. Prejudicial error with respect to this assignment is not shown, and it is accordingly overruled.

[6] Defendant moved to suppress State's Exhibit 23, the alleged murder weapon, contending it was the fruit of an illegal search and seizure in violation of the Fourth and Fourteenth Amendments to the Federal Constitution. At the voir dire hearing triggered by that motion, the State and defendant produced evidence heretofore narrated in the factual statement of this case. The trial judge made findings of fact substantially in accord with the voir dire testimony of the State's witnesses and, based on those findings, concluded as a matter of law that Agents Brady and Evans had probable cause to believe that defendant's home contained firearms in violation of federal and state laws and thus subject to seizure under a lawful search warrant. The court further concluded that the search warrants obtained by Agents Brady and Evans were not based upon information secured by Agent Terry when he entered defendant's

State v. McKenna

premises on 26 March 1975, both warrants having been issued prior to such entry. The trial court concluded that the weapon identified as State's Exhibit 23 was lawfully seized by Agent Brady and was not the fruit of any official illegality. The motion to suppress was therefore denied and State's Exhibit 23 was received in evidence over defendant's objection. The ruling of the trial court in this respect constitutes defendant's fifth assignment of error.

The Fourth Amendment does not prohibit all searches and seizures but only those which are unreasonable. *Elkins v. United States,* 364 U.S. 206, 4 L.Ed. 2d 1669, 80 S.Ct. 1437 (1960); *State v. Smith,* 289 N.C. 143, 221 S.E. 2d 247 (1976), and cases therein cited. Whether a search or seizure is unreasonable must be determined upon the facts of each individual case. *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65 (1970), *cert. denied* 404 U.S. 840, 30 L.Ed. 2d 74, 92 S.Ct. 133 (1971).

In the instant case, the findings of the trial judge that the search warrants under which Agents Brady and Evans acted were issued prior to Agent Terry's entry and were not based upon any information obtained by Agent Terry are fully supported by competent evidence presented on voir dire. These findings, therefore, are conclusive on appeal and this Court cannot properly set aside or modify them. *See State v. Curry,* 288 N.C. 660, 220 S.E. 2d 545 (1975); *State v. Thomas,* 284 N.C. 212, 200 S.E. 2d 3 (1973); *State v. Thacker,* 281 N.C. 447, 189 S.E. 2d 145 (1972); *State v. Pike,* 273 N.C. 102, 159 S.E. 2d 334 (1968); *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966), *cert. denied* 386 U.S. 911, 17 L.Ed. 2d 784, 87 S.Ct. 860 (1967). Accordingly, the admission into evidence of State's Exhibit 23 was proper and not violative of defendant's Fourth Amendment rights. This assignment is overruled.

[7]  Defendant's sixth assignment of error is based on denial of his motion for nonsuit. A nonsuit motion requires the trial court to consider the evidence in the light most favorable to the State, take it as true, and give the State the benefit of every reasonable inference to be drawn therefrom. If, when so considered, there is evidence from which a jury could find that the offense charged has been committed and that defendant committed it, the motion to nonsuit should be overruled. *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469 (1968). The credibility and weight of the evidence, and its sufficiency to remove any reasonable doubt of guilt, are matters for the jury. *State v. Jenerette,* 281 N.C. 81,

187 S.E. 2d 735 (1972) ; *State v. Primes*, 275 N.C. 61, 165 S.E. 2d 225 (1969). Discrepancies and contradictions in the evidence are, for the purposes of this motion, to be resolved in favor of the State. *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971). When the evidence here is so considered, it is sufficient to carry the case to the jury. Defendant's sixth assignment of error is overruled.

On direct examination defendant disclosed a long criminal record involving numerous housebreakings and larcenies in this and other states. For some of the offenses, he had served time in prison; for others, he had never been tried. On cross-examination the district attorney, for purposes of impeachment, asked defendant whether he had stolen particular items of property at specific addresses on nine previous occasions. While propounding the questions concerning these unrelated offenses, the district attorney, "in plain view of the jury, began holding up several criminal warrants and as he would hold one in his hand he would ask Mr. McKenna if he had broken into a house in a town specified in the warrant and stolen the amount of items specified in the warrant." Defendant's objection was overruled and defendant answered each question, denying that he committed any of the crimes mentioned. Defendant contends the court erred in permitting the district attorney to cross-examine him concerning unrelated criminal conduct and to hold the arrest warrants in his hand in view of the jury while doing so. This constitutes defendant's seventh assignment of error.

[8] A defendant who elects to testify in his own behalf surrenders his privilege against self-incrimination and knows he is subject to impeachment by questions relating to specific acts of criminal and degrading conduct. Such cross-examination for impeachment purposes is not limited to conviction of crimes but encompasses any act of the witness which tends to impeach his character. *State v. Sims*, 213 N.C. 590, 197 S.E. 176 (1938) ; *State v. Colson*, 194 N.C. 206, 139 S.E. 230 (1927). More recent cases applying this rule include *State v. Mack*, 282 N.C. 334, 193 S.E. 2d 71 (1972) ; *State v. Gainey*, 280 N.C. 366, 185 S.E. 2d 874 (1972) ; and *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971).

Here, defendant concedes the rule to be as stated but requests the Court to reexamine and repudiate it. We declined a similar request in *State v. Foster*, 284 N.C. 259, 200 S.E. 2d 782 (1973), saying: "The rule is necessary to enable the State

to sift the witness and impeach, if it can, the credibility of a defendant's self-serving testimony." We therefore adhere to both the rule and the reason for it.

[9]  Defendant further contends, however, that even if the cross-examination concerning the commission of other named criminal offenses was proper, the trial court nevertheless erred in allowing the district attorney to display the warrants in front of the jury while propounding the questions. He argues that the prosecutor was thus permitted, in effect, to cross-examine defendant as to whether he had been indicted or accused of other criminal offenses, thus doing indirectly what he could not do directly.

It would be highly improper for the prosecutor to display to the jury outstanding arrest warrants in which defendant is charged with the commission of criminal offenses unrelated to the case on trial. Such conduct would be a clear violation of *State v. Williams, supra*. Here, however, defendant concedes in his brief that "the jury was not aware that the documents were only arrest warrants and not the defendant's criminal record." Nevertheless, argues defendant, "the jury may well have mistaken the warrants held up by the district attorney for records of the defendant's criminal convictions and concluded that the defendant had not fully disclosed his prior convictions in his testimony on direct examination and was, in fact, compounding and enlarging his lies on cross-examination."

Defendant's argument is mere speculation. Just as easily the jury could have thought the papers were notes prepared by the district attorney or, not knowing what they were, could have given them no thought at all. Moreover, in light of the numerous crimes which, by his own admission, defendant had committed over the years, we think that merely "holding up" some papers, when considered in the context of the total evidence, had minimal, if any, impact on the jury and was insufficient to constitute prejudicial error. *See* 3 Strong's N. C. Index 2d, Criminal Law §§ 169, 170 (1967), and cases cited therein. Defendant's seventh assignment is therefore overruled.

[10]  Defendant contends the court erred by allowing the district attorney in his closing argument to state that defendant had lied and to argue, by negative implication, matters not in evidence. This constitutes defendant's eighth assignment of error.

The record discloses that defense counsel in his opening argument vigorously attacked the credibility of the State's witness James Charles Pittman. After pointing out several alleged inconsistencies in Pittman's testimony, counsel said: "That to me is an absolute—that proves that Mr. Pittman has told at least one absolute lie on the stand." At another point, referring to Pittman's plea-bargaining whereby he agreed to testify for the State in exchange for a ten-year prison sentence, counsel said: "I say to you, ladies and gentlemen of the jury, that's one hell of a deal."

In his closing argument the district attorney said: "Pittman has already made his bed. He's going to lie in it for ten years whichever way the case comes out. The only person whose fate hinges on this case, and he is the most interested party, and that is the defendant right over there, Ed McKenna. And that is why you're supposed to scrutinize his clearly tainted, lying testimony." At another point in his argument the district attorney said: "Who has the most interest, Pittman or McKenna? He has, McKenna has every reason to lie."

The record discloses that defendant on cross-examination stated that State's witnesses, Terry, Gaskins, Fipps, Brady, and others, had lied and only the defendant himself had testified truthfully. Commenting upon that aspect of the evidence, the district attorney said: "Everybody lied but McKenna. He hasn't committed numerous burglaries. He didn't have a hundred and eighty-two thousand dollars worth of stolen property in his home at the time he was arrested." The district attorney then explained to the jury that defendant's criminal record, if any, was competent only for the purpose of impeaching his credibility and that the State was bound by his answers. Even so, the district attorney argued that the jury "should be able to tell that Ed McKenna over here is not only a habitual felon but an accomplished and accustomed liar."

The record reveals that no objections were interposed at trial to the argument on either side. Ordinarily, an objection and exception to argument comes too late after verdict. When improper argument is made to the jury it is the duty of opposing counsel to make timely objection so the judge may correct the transgression by instructing the jury. *State v. White,* 286 N.C. 395, 211 S.E. 2d 445 (1975); *State v. Hawley,* 229 N.C. 167, 48 S.E. 2d 35 (1948). The general rule requiring objection before verdict does not apply in a capital case if the argument is so

grossly improper that removal of its prejudicial effect, after a curative instruction, remains in doubt. *See State v. Britt,* 288 N.C. 699, 220 S.E. 2d 283 (1975) ; *State v. Miller,* 288 N.C. 582, 220 S.E. 2d 326 (1975) ; *State v. White, supra; State v. Williams,* 276 N.C. 703, 174 S.E. 2d 503 (1970), *death sentence vacated* 403 U.S. 948, 29 L.Ed. 2d 860, 91 S.Ct. 2290 (1971). Here, the improper argument of the district attorney is not of such magnitude. A curative instruction from the judge, had he been afforded an opportunity to give it by timely objection, would have removed any prejudice possibly engendered by the argument. The evidence of defendant's guilt is highly convincing and there is no reasonable basis upon which to conclude that a different result would likely have ensued had the challenged argument been entirely omitted.

It is improper for the district attorney, and defense counsel as well, to assert in his argument that a witness is lying. "He can argue to the jury that they should not believe a witness, but he should not call him a liar." *State v. Miller,* 271 N.C. 646, 157 S.E. 2d 335 (1967). Ordinarily, the argument of counsel is left largely to the control and discretion of the presiding judge and wide latitude is allowed in the argument of hotly contested cases. *State v. Britt, supra; State v. Seipel,* 252 N.C. 335, 113 S.E. 2d 432 (1960) ; *State v. Barefoot,* 241 N.C. 650, 86 S.E. 2d 424 (1955). Language consistent with the facts in evidence may be used to present each side of the case. *State v. Britt, supra; State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975). These rules, however, do not license counsel to use unbridled language which exceeds the bounds of propriety or disturbs the orderly processes of the court. We do not approve the language used by the district attorney and by defense counsel. Even so, in light of the facts and circumstances disclosed by the record, we do not think its use constitutes prejudicial error requiring a new trial. Failure of defense counsel to object when the district attorney's argument was made is some indication that, at the time, he thought his own remarks had triggered the argument or else thought his client was suffering no harm. Defendant's eighth assignment of error is overruled.

[11]  The Federal search warrant (State's Exhibit 24) and the State search warrant (State's Exhibit 25) were admitted into evidence *without objection.* Federal Agent Brady testified that he swore to the affidavit upon which the Federal warrant was issued and, having taken the stand, he was subject to cross-

examination. SBI Agent Evans testified that he swore to the affidavit upon which the State search warrant was issued and, having taken the stand, he was subject to cross-examination. Defendant now argues on appeal that the affidavits are hearsay and contain prejudicial allegations concerning the presence of stolen property at defendant's home. Defendant assigns as error the admission of these affidavits, citing *State v. Spillars,* 280 N.C. 341, 185 S.E. 2d 881 (1972), and *State v. Jackson,* 287 N.C. 470, 215 S.E. 2d 123 (1975). This requires a brief examination of the cited cases.

In *Spillars* an affidavit used to obtain a search warrant was introduced into evidence. The affiant did not take the stand. The statements and allegations contained in the affidavit were hearsay and indicated defendant's complicity in another crime. Held: Admission of the affidavit was error because admission of hearsay statements deprived defendant of his right of confrontation and cross-examination and permitted the State to strengthen its case by the use of incompetent evidence.

In *Jackson* the State offered and the court received in evidence, over objection, the complaint and warrant issued thereon for defendant's arrest. Held: The trial court committed prejudicial error in the admission of the complaint executed by a police officer who did not testify at trial because the State was thereby permitted to strengthen its case with incompetent hearsay evidence by a person who was not subject to cross-examination.

The principles enunciated in *Spillars* and *Jackson* are sound and we reaffirm them. These cases, however, are clearly distinguishable from the instant case. Here, (1) the affidavits supporting the issuance of the search warrants were received into evidence *without objection* and (2) both affiants took the witness stand and submitted themselves to cross-examination. These witnesses testified on direct and cross-examination to substantially the same matters contained in the affidavits, including the presence of stolen firearms and other stolen property in defendant's home. Thus the hearsay statements in the affidavits were merely corroborative, and the affiants' availability for cross-examination permitted the defendant to confront the witnesses against him and to cross-examine them. Furthermore, defendant himself testified to some of the matters contained in the affidavits. In light of these facts, we hold that introduction of the affidavits upon which the search war-

State v. McKenna

rants were obtained was not prejudicial error. This assignment is overruled.

Defendant's final assignment of error is grounded on denial of his motions in arrest of judgment, for a mistrial, for a new trial and to set aside the verdict.

[12] A motion in arrest of judgment is based upon the insufficiency of the indictment or some other fatal defect appearing on the face of the record. *State v. Armstrong,* 287 N.C. 60, 212 S.E. 2d 894 (1975) ; *State v. McCollum,* 216 N.C. 737, 6 S.E. 2d 503 (1940). Judgment may be arrested in a criminal prosecution when, and only when, some fatal error or defect appears on the face of the record proper. *State v. Kirby,* 276 N.C. 123, 171 S.E. 2d 416 (1970) ; *State v. Higgins,* 266 N.C. 589, 146 S.E. 2d 681 (1966). The face of the record in this case reveals no fatal defect; consequently, denial of the motion in arrest of judgment was proper.

[13] Motions to set aside the verdict and for a new trial are addressed to the sound discretion of the trial court and, absent abuse of discretion, refusal to grant them is not reviewable. *State v. McNeill,* 280 N.C. 159, 185 S.E. 2d 156 (1971) ; *State v. Reddick,* 222 N.C. 520, 23 S.E. 2d 909 (1943). These motions were properly denied.

[14] Defendant's motion for a mistrial was made after verdict and therefore came too late. In a capital case the court may order a mistrial without the consent of the accused only in cases of necessity to attain the ends of justice. *State v. Moore,* 276 N.C. 142, 171 S.E. 2d 453 (1970) ; *State v. Harris,* 223 N.C. 697, 28 S.E. 2d 232 (1943) ; *State v. Cain,* 175 N.C. 825, 95 S.E. 930 (1918) ; *State v. Tyson,* 138 N.C. 627, 50 S.E. 456 (1905). In capital cases the court must find the facts and place them in the record to the end that the court's action may be reviewed on appeal. *State v. Boykin,* 255 N.C. 432, 121 S.E. 2d 863 (1961) ; *State v. Crocker,* 239 N.C. 446, 80 S.E. 2d 243 (1954). Defendant's brief contains no citation of authority but merely states the contention that error was committed in overruling the motion. The motion was a mere formality, tardily made, and was properly denied.

A careful examination of all defendant's assignments of error discloses no reason in law to disturb the verdict and judgment. In the trial below we find

No error.