## STATE v. WILEY BRANTLEY.

*Homicide—Circumstantial Evidence—Motive.*

On trial for murder where the prosecution relies upon circumstantial evidence to convict the prisoner, the inquiry as to collateral facts, which must be established by direct evidence, is restricted to those having a reasonable connection with the main fact at issue—not such a connection as will show that the collateral and main fact often go together, but such as will show that they most usually do so. This rule applied to the facts of this case entitles the prisoner to a new trial for error committed by the court in not withdrawing from the jury the testimony relating to the motive of the prisoner in killing the deceased.

(*Bottoms* v. *Kent,* 3 Jones, 154; *State* v. *Vinson,* 63 N. C., 335, cited and approved.)

INDICTMENT for murder, tried at Fall Term, 1880, of NASH Superior Court, before *Gudger, J.*

The prisoner was charged with the killing of Crawford Eatman on the 23d day of November, 1878. The jury rendered a verdict of guilty, and from the judgment pronounced he appealed to this court.

*Attorney General,* for the State.
*Messrs. Connor & Woodard,* for the prisoner.

RUFFIN, J. Of the several exceptions taken for the prisoner on the trial below, it is necessary that we should consider those only which go to the incompetency and insufficiency of the evidence admitted and relied on for his conviction, as we are of the opinion that these were well taken and entitle him to another trial.

We understand from the case as stated that there was no direct evidence to connect the prisoner with the homicide, but that the state for this purpose relied wholly upon the inferences to be deduced from the evidence stated in the

case, and no other, as constituting a chain of circumstances sufficiently strong to warrant a conviction. That evidence was as follows:

After establishing the fact that on a certain Saturday morning the prisoner and the deceased, the latter being a lad of eleven years of age, carried about a hundred pounds of cotton to the town of Wilson and there sold it, that on their way home in the evening, the two had some disagreement about a small sum of money which the deceased alleged the prisoner owed him, and that the killing was done on that same Saturday night, the state offered to show by one Jones, and after exception on the part of the prisoner, was allowed to show, that on the same night about midnight the witness was aroused by the barking of his dog, and immediately went to his cotton house where he found that about one hundred pounds of cotton had been stolen; very early the next morning he went again to the cotton house where he found tracks of two persons, which, being familiar with the tracks of the deceased and of the wife of the prisoner, he recognized as theirs; and about twenty-five yards from the cotton house in the jam of a fence he found the tracks of another person, which seemed to be those of a man, but whose he could not tell; that the tracks after leaving the cotton house went through a lane and turned into a path leading towards the house of the prisoner, but could be traced no further; that until the Saturday night in question witness had not visited his cotton house since the preceding Thursday, but there had been no rain in the meantime: And by one Locust, that on the Monday morning next after the homicide he had examined the prisoner's cotton crop as it stood in the field, and found that not more than ten pounds of it had been picked out.

The theory suggested by the state, and which the solicitor argued was supported by the foregoing facts, was, that the prisoner and the deceased had been associated in the larceny

of the cotton taken from the cotton-house and sold in Wilson, and that the prisoner's motive to slay the deceased was to prevent his being a witness against himself in the event he should be charged with that offence.

After the evidence was closed, the prisoner through his counsel moved the court to withdraw from the consideration of the jury the testimony of the two witnesses, Jones and Locust, for the reason that if taken to be altogether true, it could raise but a bare suspicion of the motive ascribed to the prisoner on the part of the state, which the court declined to do, and the prisoner excepted.

In considering the competency of the testimony excepted to, we will not stop to inquire whether any part of it comes within the rule of *res inter alios acta*, though we are not by any means sure that much of it might not have been excluded under the principle of that rule.

As many crimes, and especially those most dangerous in their consequences, were perpetrated with such secrecy that no direct proof could be adduced to establish the guilt of the offenders, it early became necessary for the protection of society that the courts should countenance a resort to circumstantial testimony, that is, should permit certain collateral facts to be established by direct evidence, from which facts inferences might reasonably be drawn as to the existence of other facts inconsistent with the innocence of the accused. But it was soon discovered that such a practice, while it afforded to society the needed protection, might, if unrestrained, be attended with consequences dangerous to the accused, and thereupon the courts sat to work to frame certain rules for its use, which were from time to time modified as experience taught to be necessary. Amongst other hazards and inconveniences, it was found that to allow evidence to be given touching every collateral matter that could be supposed, however remotely, to throw any light upon the main fact sought to be established, had the effect

to render trials too complicated, and to confuse and mislead rather than enlighten the juries, and at the same time to surprise the party on trial, who could not come prepared to disprove every possible circumstance, but only such as he might suppose to be germane and material. And therefore the main rule was adopted of restricting the inquiry to such facts as, though collateral to the matter at issue, had a *visible, reasonable* connection with it—not such a connection as would go to show that the two facts, the collateral one and the main one, sometimes or indeed often go together, but such as will show that they *most usually* do so. This rule taken, as he says, from Best on the Principles of Evidence, the late Chief Justice PEARSON thus expressed in the case of *Bottoms* v. *Kent,* 3 Jones, 154: "The rule that evidence which is too remote is inadmissible may be thus stated: that as a condition precedent to the admissibility of evidence, the law requires an *open and visible* connection between the principles and the evidentiary facts; this does not mean a *necessary* connection which would exclude all presumptive evidence, but such as is *reasonable* and not latent or conjectural."

Considered in the light of this rule, was the evidence objected to competent? Concede to it full efficacy in establishing the facts that the prisoner was in complicity with his wife and the deceased in stealing Jones' cotton, that it was the same cotton which the two carried to Wilson and sold, and that the prisoner knew that Jones had discovered the loss of his cotton on Saturday night, still, were these facts such as might be expected to create a reasonable, natural inference of the existence of the main fact, to wit, a motive on the part of the prisoner for slaying the deceased? It is not sufficient that the two *may* coexist, or that the chances of their mutual existence are even. The inference must be that the one fact *most usually* attends the other. As said by Judge RODMAN in *State* v. *Vinson,* 63 N. C., 335, " if

49

the fact offered to be proved be equally consistent with the existence or non-existence of the fact sought to be inferred from it, then the evidence can raise no presumption either way and should not be admitted."

Is it not clear that the conviction of the prisoner was the result, not of a legitimate and natural deduction from the facts as established by the evidence, but of a conjecture based upon facts existing only in the supposition of the jury? or in other words, did not the jury guess, first, at the fact that the deceased had learned of the discovery of the loss of the cotton by Jones; secondly, that in order to screen himself he had formed the purpose to betray his companion; and thirdly, that the prisoner had become conscious of such his intention, and therefrom infer the motive of the prisoner to commit the crime with which he is charged? If these facts had been proved, then the conclusion of the jury might be seen to bear a natural and apparent relationship to them; at all events, it would then have been a matter strictly within their province and of which they were to be the sole judges, as decided in *State* v. *Morris, ante,* 756. But juries are not allowed to act upon mere conjecture, nor is evidence admissible before them which can only furnish grounds for a conjecture.

We fully recognize the difficulty which a judge presiding on the circuit must experience when called hastily to determine between that which amounts to slight evidence and that which constitutes no evidence, and especially when the efficacy of that which is offered, and indeed its very competency, may somewhat depend upon the order in which it is brought forward on the trial. But if on the spur of the moment evidence should be admitted as to the existence of a fact bearing no relation to the main fact, or such a relation as could only afford grounds for a conjecture on the part of the jury, it should be withdrawn entirely from their consideration, as the court below was requested to do in the

case of the prisoner, and in the refusal of which we hold there is error.

Error.                                                    *Venire de novo.*