STATE OF NORTH CAROLINA v. LESLY JEAN

No. 112A83

(Filed 2 February 1984)

**1. Criminal Law § 66.4— photographic and lineup identifications—defendant only person in both—no impermissible suggestiveness**

Pretrial photographic and live lineup identification procedures were not impermissibly suggestive because defendant was the only person who appeared in both photograph and live lineups where a rape victim could make no positive identification at the first photographic procedure but made a tentative identification of defendant as her assailant upon viewing the photographs a second time; the victim testified that her reluctance to make a more positive identification at that time was due to the fact that she realized the seriousness of the offenses charged and that there were certain identifying features not visible in the photograph; and the victim testified that she based her identification of defendant at the live lineup on the fact that she saw freckles on defendant's face which did not appear on the photograph and that she also recognized certain distinctive features of defendant's profile.

**2. Criminal Law § 66.4— photographic and lineup identification procedures—hypnosis prior to live lineup—procedures not impermissibly suggestive**

Pretrial photographic and live lineup identification procedures were not impermissibly suggestive because the victim was hypnotized prior to the live lineup to see if she could recall why defendant's photograph had bothered her where the victim, immediately after the assault, had provided law enforcement authorities with a complete, detailed, and reasonably accurate description of her assailant, and where the victim testified that no new information developed as a result of the hypnotic session.

**3. Constitutional Law § 30; Bills of Discovery § 6— statements of witness—no discovery for voir dire hearing**

Defendant was not entitled to discovery of the victim's statement for the purpose of cross-examination at a voir dire hearing on a motion to suppress her identification testimony even though the voir dire hearing took place at trial after the jury had been selected. Rather, defendant's rights were protected when defendant was provided with the victim's statement prior to her cross-examination before the jury.

**4. Criminal Law § 86.5— cross-examination of defendant—viewing of pornographic movie**

In a prosecution for first degree rape and first degree sexual offenses, even if it was error for the trial court to permit, for the purpose of showing prior disparaging conduct, cross-examination of defendant about his viewing a pornographic movie in a motel room with a female companion five days after the crimes charged which depicted the same kind of sex acts with which defendant was charged, such error was harmless when viewed in the context of all the evidence and in light of the substantial evidence of defendant's guilt.

**5. Rape and Allied Offenses § 5— first degree rape and sexual offenses—use of deadly weapon—infliction of serious injury—sufficiency of evidence**

The evidence in a prosecution for first degree rape and first degree sexual offenses was sufficient for the jury to find that defendant employed or displayed a deadly weapon where it tended to show that the victim was threatened with a pair of vise grips, notwithstanding defendant used the grips to feign the presence of a gun, since the victim had every reason to fear that the vise grips could and would be used to harm her. Furthermore, the evidence was sufficient for the jury to find that defendant inflicted serious personal injury on the victim where it tended to show that the victim suffered a bruised and swollen cheek, a cut lip, and two broken teeth.

Justice MARTIN concurring.

Chief Justice BRANCH joins in this concurring opinion.

Justice EXUM dissenting.

Justice FRYE joins in this dissenting opinion.

BEFORE *Phillips, J.*, at the 29 November 1982 Criminal Session of Superior Court, ONSLOW County, defendant was convicted of three counts of first degree sexual offense and one count of first degree rape. He appeals from the imposition of two consecutive life sentences. Heard in the Supreme Court 3 October 1983.

As a basis for his appeal, defendant assigns as error the denial of his motion to suppress the victim's identification testimony; the trial court's refusal to permit defense counsel to view the victim's statements prior to cross-examining her during the voir dire hearing on the motion to suppress; the trial court's permitting the prosecutor to cross-examine the defendant concerning certain acts of misconduct; and the trial court's failure to dismiss the charges where there was insufficient evidence that defendant either employed a deadly weapon or inflicted personal injury on the victim. We find no error.

The facts, briefly stated, are as follows: On 21 July 1982, Mrs. Alice Kathleen Wilson awoke at approximately 3:00 a.m. to find a man standing at the foot of her bed. Over the course of the next hour and fifteen minutes, she endured a nightmare of the most degrading perversion. She was subjected to unnatural sexual acts; she was threatened with a pair of vise grips; she was beaten and she was raped. Mrs. Wilson was twenty-seven years old at the time. She was married, and the mother of three young children,

the youngest of whom remained asleep in the bedroom where the assaults took place. Her husband was at work. We deem it unnecessary to further stain the pages of our reports with the sordid details of this victim's ordeal. *State v. Warren*, 309 N.C. 224, 311 S.E. 2d 266 (1983). Suffice it to say that as a result of the victim's detailed description of her assailant, the defendant was subsequently arrested, charged, and convicted of these crimes. Additional facts necessary to a determination of the issues will be discussed in the opinion.

*Rufus L. Edmisten, Attorney General, by Special Deputy Attorney General Ann Reed, for the State.*

*Marc D. Towler, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

Defendant first contends that the trial court erred in denying his motion to suppress the identification testimony of Mrs. Wilson, arguing that the testimony was the product of a pretrial identification procedure which was so impermissibly suggestive that it created a substantial likelihood of irreparably mistaken identification.

Following a voir dire hearing on defendant's motion to suppress, the trial court made the following findings of fact:

2. That Alice Kathleen Wilson retired for bed at approximately one o'clock A.M. on the 21st of July and before retiring for bed she left the lights on in her hallway, living room and kitchen.

3. That the lights from the kitchen and living room shown in through her bedroom.

5. That at 3:00 A.M. on July 21st, 1982, Mrs. Wilson awoke from her sleep and observed a black male standing over her. That this person grabbed Mrs. Wilson and forced her to submit to various acts of sexual and oral intercourse within her bedroom. That this intruder was in Mrs. Wilson's bedroom for an hour and 15 minutes and that during this time Mrs. Wilson was within a foot of him for an hour of that time.

6. That these various acts of sexual intercourse and oral intercourse occurred in an area of Mrs. Wilson's bedroom where she could see very clearly who her intruder was because of the light emanating from the kitchen into her bedroom.

8. That Mrs. Wilson described her assailant as being approximately 5 feet 8 inches tall, 160-165 pounds, wearing dark navy blue jogging shorts, dark teeshirt, white high-top Nike tennis shoes with a black swirl on the side of the tennis shoes, almond eyes, high cheek bones, fairly thick lips, and a freckle on the left side of her assailant's face.

9. That her assailant left her house at approximately 4:15 A.M. and Mrs. Wilson thereafter reported the sexual assault to the police. That at this time the Jacksonville Police Department placed the description of Mrs. Wilson's assailant over the radio and this was disseminated to various police officers in Jacksonville.

10. That at approximately 4:40 A.M. Officer Jim Shingleton of the Jacksonville Police Department stopped a person along LeJeune Blvd. in Jacksonville meeting the description of Mrs. Wilson's assailant. That Officer Shingleton frisked this person and was in this person's presence for a period of about 2 minutes. That thereafter this person ran from Officer Shingleton into the woods along Lejeune Blvd. and was not to be found on that particular morning.

11. That on July 26th, 1982 Officer Shingleton saw the defendant at Dunkin' Donuts in Jacksonville located 2 houses away from 104 Sherwood Rd. and at that time seized the defendant and took him to the police station in Jacksonville. At that time the defendant granted permission to Detective Steve Smith of the Jacksonville Police Department to search his wall locker. That Officer Smith after executing said search returned Lesly Jean to the police department where Lesly Jean consented to the taking of his photograph. Lesly Jean was then released at 2:30 on the 27th of July, 1982.

12. That on July 27th, 1982, Detective Smith made up a photographic lineup containing 6 black males including the defendant. That these photographs depicted persons in their

early 20's from the waist up including their head. That these pictures were all similar in physical description.

13. That these photographs were displayed to Alice Kathleen Wilson on July 27, 1982 at the Jacksonville Police Department. That these photographs were displayed in a folder. That these photographs were displayed in a nonsuggestive manner. That Detective Smith never told Alice Kathleen Wilson which person or persons he suspected of this crime. That Alice Kathleen Wilson was unable at that time to select a photograph of her assailant.

14. That on July 28th, 1982, Alice Kathleen Wilson asked to see the photographic lineup again. That at 6:30 on July 28, 1982, she viewed the same photographs displayed to her on the 27th of July, 1982. That again these photographs were displayed in a non-suggestive manner by Detective Steve Smith and he did not tell her at any time which of those photographs, if any, were suspects in the rape case. That after viewing this photographic lineup, Mrs. Wilson told Detective Smith that photograph number 5 appeared as if he was looking at her and stated 'That's the one who makes me feel sick.' That photograph number 5 is the defendant Lesly Jean.

15. That on August 3rd, 1982, Detective Steve Smith asked Lesly Jean if he would consent to reading various sentences into a tape recorder for the purpose of recording his voice. That Lesly Jean consented to doing this and did so. That Detective Smith also asked 4 other persons to do the same thing. That the voices were recorded onto a tape recording. That the voices are all fairly similar in sound.

16. That on August 4th, 1982, this tape recording was played for Mrs. Wilson and she selected voice number 3, that of Lesly Jean, as her assailant by stating the words 'Number 3 sounds like the one that was in my bedroom the other night.' That this voice identification procedure was conducted in a non-suggestive manner. That Detective Smith never told Mrs. Wilson which of the voices if any were suspected of being her assailant.

17. That the investigation of this case continued until the 17th of September, 1982, whereupon Lesly Jean came to the police department of his own volition. That at this time Lesly Jean was not under arrest and was appearing at the police station voluntarily, of his own will and accord. That Lesly Jean agreed to participate in a live lineup which occurred at the police station. That this lineup consisted of, in addition to Lesly Jean, two other black males who were similar in physical size and description to Lesly Jean. That Lesly Jean was given a chance to select which position of the lineup he would stand and he selected to stand in between the two other black males. That Mrs. Wilson viewed these persons from behind a glass window wherein she only saw the person from the waist up including their head. That these persons had their shirts off at this time and Mrs. Wilson could see the bare chest of each person and his face. That these lineup procedures were conducted in a totally non-suggestive manner and Mrs. Wilson was never told by anyone who, if any, of the persons were suspected of being her assailant. That after viewing these persons for a few moments Mrs. Wilson selected person number 2, that of Lesly Jean, as being her assailant. That the defendant, before participating in the lineup, was told that he had a right to counsel and he voluntarily waived a right to counsel before participating in the lineup. That at this time Mrs. Wilson indicated that she was positive that Lesly Jean was in fact her assailant. That at the time of this viewing Mrs. Wilson noted a freckle on the left cheek of the defendant, the same freckle she recalled seeing the morning of her assault. At the time of this lineup procedure, no adversary judicial criminal proceedings had been initiated against the defendant.

18. That after Mrs. Wilson was attacked her description to the Jacksonville Police Department included her assailant's height, weight, complexion, distinguishing facial features, build, and voice. That this description was extremely detailed and more than ordinarily thorough. That she expressed no doubt what-so-ever that the defendant was the person who raped her.

19. That Mrs. Wilson's identification of the defendant in the courtroom is based on her observation of him in her

house on the morning of July 21, 1982 and is not tainted by any pretrial identification procedures.

20. That the Court has had an opportunity [to] observe Mrs. Wilson's testimony in court during the Voir Dire and notes that the witness had over one hour and 15 minutes in the presence of the defendant. That during this time she was within extremely close proximity of the defendant for an hour out of this hour and 15 minutes. That during this time her degree of attention was directed towards the defendant at all times. That the accuracy of Mrs. Wilson's prior description of her assailant conforms with the way the defendant appears in court today and Mrs. Wilson is absolutely positive that the defendant is her assailant.

Based on the above findings of fact, the trial court concluded:

1. That the photographic lineup procedure was not impermissibly suggestive and was proper in all respects.

2. That the totality of the circumstances does not reveal a pretrial procedure so unnecessarily suggestive and conducive to irreparable mistaken identification as to offend fundamental standards of decency, fairness and justice.

3. That the photographic lineup procedure does not give rise to any likelihood of irreparable misidentification.

4. That the voice identification procedures were not impermissibly or unduly suggestive and were proper in all respects.

5. That the totality of the circumstances does not reveal a pretrial procedure so unnecessarily suggestive and conducive to irreparable misidentification as to offend fundamental standards of decency, fairness and justice.

6. That the voice identification procedure does not give rise to any likelihood of irreparable misidentification.

7. That the live lineup which occurred on September 17, 1982 was not impermissibly or unduly suggestive and was perfectly proper in all respects.

8. That the defendant did not have a constitutional right to the presence [of] counsel at the live lineup because no adversary judicial criminal proceeding had been initiated against the defendant prior to this confrontation.

9. That this identification procedure did not give rise to any likelihood of irreparable misidentification and was not so suggestive as to deprive the defendant of due process of law.

Sometime after viewing the photographic lineup, in late July or early August, Mrs. Wilson was hypnotized for purposes of determining further details concerning her description of the defendant. Mrs. Wilson stated that nothing new developed as a result of the hypnosis.

In support of his contention that the pretrial identification procedure was impermissibly suggestive, defendant points to the following:

[1] (1) Defendant was the only person who appeared in both photographic and live lineups, therefore a possibility exists that Mrs. Wilson may have identified the defendant in the live lineup because he was the only man she had seen in the two previous photographic arrays. The record suggests otherwise.

After viewing the first photographic array, the victim could make no positive identification. She testified that she became physically ill that evening after viewing the photographs because one of them bothered her. She asked to view the same lineup the next day at which time she stated that the photograph of the defendant was the one that made her feel sick. At this point, then, the victim had made a tentative identification of the defendant as her assailant. She testified that her reluctance to make a more positive identification at that time was due to the fact that she realized the seriousness of the offenses charged and that there were certain identifying features not visible in the photograph. It was, nevertheless, a tentative identification which a live lineup merely served to reinforce once the victim was afforded an opportunity to observe certain details of her assailant's appearance not observable in the photograph. As she viewed the live lineup, the victim asked to view defendant's profile. She then became emotionally upset and identified the defendant as her assailant. She testified that she based her identification of the

defendant at the live lineup on the fact that she saw freckles on the defendant's face which she observed on her assailant. She did not see the freckles on the front view photograph of the defendant which appeared in the photographic lineup. She also recognized certain distinctive features of the defendant's profile.

[2] (2) Mrs. Wilson was hypnotized prior to viewing the live lineup in order to see if she could recall why defendant's photograph had bothered her. This fact, according to defendant, "greatly enhanced the possibility of an unconscious transference causing her to mistakenly relate to her recollection of defendant's photograph rather than to the features of the assailant she actually observed on the night of the crime." We reject defendant's argument based on two significant facts which emerge from this record. First, the victim, immediately after the assault, had provided law enforcement authorities with a complete, detailed, and, under the circumstances of the trauma she experienced, a reasonably accurate description of her assailant.[1] Second, the victim testified that no new information developed as a result of the hypnotic session.

We conclude that because the victim's initial description of her assailant was sufficiently detailed to result in a composite drawing upon which defendant's subsequent apprehension was based, and because the articulated basis for the victim's positive identification was independent of any possible suggestiveness in the procedure, the pretrial identification procedure cannot be said to be so impermissibly suggestive as to create a substantial likelihood of irreparable mistaken identification. The trial court's findings of fact support its conclusions of law and defendant's motion to suppress the identification testimony was properly denied. *See State v. Chatman,* 308 N.C. 169, 301 S.E. 2d 71 (1983).

[3] Defendant next contends that he was denied due process when the trial judge refused to permit defense counsel to view the victim's statement prior to cross-examining her during the voir dire hearing on the motion to suppress her identification

---

1. In his brief defendant argues that the original description given by Mrs. Wilson did not include the fact that the assailant's white shoes were tied with black shoelaces or that his jogging shorts had white stripes as did the shorts seized from defendant, hence the description "failed to include anything which would set the man apart from hundreds of joggers." The argument is specious.

testimony. Defendant argues that because the trial court denied his request without conducting an *in camera* hearing to determine whether the statement contained inconsistencies useful for impeachment purposes, reversible error was thereby committed. He cites to *State v. Hardy*, 293 N.C. 105, 235 S.E. 2d 828 (1977), which held that G.S. § 15A-904(a) does not bar discovery of prosecution witnesses' statements *at trial* and that the appropriate procedure for disclosure once a request has been made is for the trial judge to order an *in camera* inspection of the statement to determine its relevance for, as an example, impeachment purposes. In the instant case the voir dire hearing took place after the jury had been selected. Thus, argues defendant, although defense counsel requested the statement for purposes of cross-examination at the voir dire hearing on the motion as opposed to cross-examination before the jury, the voir dire hearing took place *at trial.* Therefore the trial judge was required to follow the *in camera* procedure outlined in *Hardy* once defense counsel requested the statement.

We addressed this issue in *State v. Williams*, 308 N.C. 357, 302 S.E. 2d 438 (1983). In *Williams* the defendant, too, argued that the victim's statements were critical to defense counsel's cross-examination of the prosecuting witness at a voir dire hearing on a motion to suppress identification testimony. The jury had, however, not yet been empaneled in *Williams*. There we declined to extend the rule enunciated in *Hardy* to permit discovery of a prosecuting witness's statements for the purpose of cross-examination at the voir dire. We adhere to our holding in *Williams* and reject defendant's argument that the technical distinction of whether a jury has or has not been empaneled is of some consequence in determining whether the statements may be discoverable *at trial.* Rather, the issue is whether the statements are made available to the defendant *during trial before a jury* after direct examination of the witness.[2] As we stated in *Williams*,

---

2. The Legislature has spoken to this issue by amending G.S. § 15A-903, effective for trials held after 14 July 1983. That section now reads: "(f) Statements of State's Witnesses. (1) In any criminal prosecution brought by the State, no statement or report in the possession of the State that was made by a State witness or prospective State witness, other than the defendant, shall be the subject of subpoena, discovery, or inspection until that witness has testified on direct examination in the trial of the case. (2) After a witness called by the State has testified on direct examination, the court shall, on motion of the defendant, order the State to

State v. Jean

"[w]hatever impeachment value there [is] in the victim's statements [goes] to the weight of the victim's identification of the defendant rather than to its admissibility." *Id.* at 361, 302 S.E. 2d at 441.

In the case *sub judice* defendant was provided with the victim's statement prior to cross-examination before the jury. At that time the alleged "inconsistency" between the statement and her trial testimony was fully explored by defense counsel. That is, she testified that although she had not mentioned, as part of her initial description of her assailant, that he had a freckle or mole on the side of his face, she did tell the officer who compiled the composite drawing about the freckle. This fact was corroborated by the officer who prepared the composite. The assignment of error is without merit.

---

produce any statement of the witness in the possession of the State that relates to the subject matter as to which the witness has testified. If the entire contents of that statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use. (3) If the State claims that any statement ordered to be produced under this section contains matter that does not relate to the subject matter of the testimony of the witness, the court shall order the State to deliver that statement for the inspection of the court *in camera.* Upon delivery the court shall excise the portions of the statement that do not relate to the subject matter of the testimony of the witness. With that material excised, the court shall then direct delivery of the statement to the defendant for his use. If, pursuant to this procedure, any portion of the statement is withheld from the defendant and the defendant objects to the withholding, and if the trial results in the conviction of the defendant, the entire text of the statement shall be preserved by the State and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this subsection, the court, upon application of the defendant, may recess proceedings in the trial for a period of time that it determines is reasonably required for the examination of the statement by the defendant and his preparation for its use in the trial. (4) If the State elects not to comply with an order of the court under subdivision (2) or (3) to deliver a statement to the defendant, the court shall strike from the record the testimony of the witness, and direct the jury to disregard the testimony, and the trial shall proceed unless the court determines that the interests of justice require that a mistrial be declared. (5) The term 'statement', as used in subdivision (2), (3), and (4) in relation to any witness called by the State means a. a written statement made by the witness and signed or otherwise adopted or approved by him; b. a stenographic, mechanical, electrical, or other recording or a transcription thereof, that is a substantially verbatim recital or an oral statement made by the witness and recorded contemporaneously with the making of the oral statements." 1983 N.C. Sess. Laws, chapter 759.

[4] Defendant's third assignment of error concerns a matter brought out on cross-examination of the defendant which he contends was error because it was irrelevant to the issue being tried in the case, "highly inflammatory" and "extremely prejudicial."

At trial the defendant took the stand and testified on his own behalf. He testified on direct examination that on the night of 26 July he had been at the Deluxe Hotel with a "young lady" and from there went to Dunkin' Donuts where he was first apprehended. On cross-examination he was questioned further concerning what transpired at the Deluxe Hotel prior to his arrest. He admitted that he and the unidentified young woman were in the hotel room viewing pornographic movies depicting acts of sexually deviant behavior. The acts depicted were the same type of sexual acts that had been forced upon the victim five days earlier. Defendant argues that the conduct in question was not necessarily wrongful and therefore not admissible as a specific act of degrading conduct. The defendant further argues that even if this evidence is relevant, it should be excluded because its probative force is comparatively weak and the likelihood of its playing upon the passions and prejudices of the jury is great.

The State contends that this conduct related to defendant's character, or lack thereof, and was a proper subject for cross-examination. 1 Brandis on North Carolina Evidence § 43 (1982). *State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161 (1980). The State argues that this evidence of prior disparaging conduct by a defendant is properly admissible upon cross-examination of that defendant, not as substantive evidence of guilt, but rather for purposes of character impeachment. *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, *death penalty vacated*, 429 U.S. 912, 50 L.Ed. 2d 278 (1976); 1 Brandis on North Carolina Evidence § 80.

The cases and authorities which tend to support the State's position are: *State v. Sparks*, 307 N.C. 71, 296 S.E. 2d 451 (1982) (Exum, J., citing the general rule that a criminal defendant who testifies may be cross-examined for purposes of impeachment concerning any prior specific acts of criminal and degrading conduct, but error here where prosecutor's query, in a first degree sexual offense case, concerning sexual improprieties failed to identify a *specific act* of misconduct); *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (1980) (Exum, J., holding no error in admissibility of evi-

dence regarding defendant's sexual relations with other women and other forms of misconduct brought out on cross-examination of defendant himself); *State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161 (Copeland, J., holding that district attorney could properly ask defendant on cross-examination if he had called the district attorney a "punk" and had mouthed the word "mother" to him); *State v. Lester*, 289 N.C. 239, 221 S.E. 2d 268 (1976) (Exum, J., holding that an accused person who testifies as a witness may be cross-examined regarding prior acts of misconduct, in this case circumstances of defendant's undesirable discharge from military service); *State v. Gurley*, 283 N.C. 541, 196 S.E. 2d 725 (1973) (Lake, J., holding defendant properly cross-examined about his possession of, familiarity with, and interest in pornographic magazines); and 1 Brandis on North Carolina Evidence § 111 and cases cited thereunder.

We find it unnecessary to address the question of the admissibility of this evidence on cross-examination concerning defendant's conduct in watching these movies in the motel room with the young woman to show prior disparaging conduct. Assuming *arguendo* that it should not have been admitted, we find the error harmless. Taken in the context of all the evidence and in view of the substantial evidence of defendant's guilt, it is completely unreasonable to assume that this item of evidence was, in the minds of the jurors, a determining factor in assessing defendant's guilt. Immediately following the assault, the victim gave a description of her assailant from which a composite drawing was made. Defendant was recognized by a police officer and arrested based on this composite drawing. The victim made a positive voice identification, and an unequivocal in-court identification, based solely on her observations at the time of the crime. Results of blood tests pointed to the defendant as the perpetrator of the crime. Clothes matching those worn by the assailant were discovered in defendant's locker. There is no reasonable possibility that had the evidence been excluded, a different result would have been reached at trial. G.S. § 15A-1443(a); *State v. Jordan*, 305 N.C. 274, 287 S.E. 2d 827 (1982). We find no prejudicial error in the admission of this testimony.

[5] Finally, defendant contends that the trial court erred in failing to dismiss the charges against him because of insufficient evidence that defendant either employed a deadly weapon or in-

State v. Jean

flicted serious personal injury on the victim. He argues that although the vise grips employed by defendant in this case could possibly be considered a deadly weapon, because he employed them to feign the presence of a gun and "neither by words nor by gestures indicated that the Vice Grips (sic) would be used as a club," the evidence was insufficient to support a finding that defendant employed a deadly weapon. As we understand defendant's reasoning, he argues that because he threatened to shoot the victim with the vise grips, her fear that he was going to crush her skull with them was inconsistent with the manner in which the weapon was employed or displayed. The argument is specious. Irrespective of the impossibility of defendant's intent to shoot the victim with a pair of vise grips, the victim had every reason to fear that the vise grips could and would be used to harm her. The jury was instructed to consider "the nature of the Vice Grips (sic), the manner in which it is used and the size and strength of Lesly Jean as compared to Kathy Wilson." The evidence was sufficient for the jury to find that defendant employed or displayed a deadly weapon. *See State v. Powell,* 306 N.C. 718, 295 S.E. 2d 413 (1982).

We, likewise, reject defendant's contention that there was insufficient evidence that he inflicted serious personal injury on the victim. Mrs. Wilson suffered a bruised and swollen cheek, a cut lip, and two broken teeth. The evidence was sufficient to support a finding of serious personal injury. *See State v. Roberts,* 293 N.C. 1, 235 S.E. 2d 203 (1977).

The defendant in this case appears to have been ably represented both at trial and on his appeal. In light of the severity of his sentence, we have reviewed his assignments of error with care and find none sufficiently prejudicial to warrant a new trial.

Defendant received a fair trial free of prejudicial error.

No error.

Justice MARTIN concurring.

I concur in the majority opinion. However, with respect to the impeachment issue, I find that the cross-examination of defendant was competent and admissible for the purpose of impeaching defendant's credibility. *State v. Gurley,* 283 N.C. 541,

State v. Jean

196 S.E. 2d 725 (1973), controls this issue. In *Gurley,* evidence of defendant's possession of, familiarity with, and interest in pornographic magazines and photographs of nude women (defendant made one of the photographs) was held competent for the purpose of impeachment. *Gurley* has been cited as authority to impeach a defendant by questions on cross-examination about his possession of, familiarity with, and interest in pornographic magazines in 4 Strong's N.C. Index 3d *Criminal Law* § 86.5 (1976) and 1 Brandis on North Carolina Evidence § 111 (1982). The bench and bar rely upon these texts. No other citations of *Gurley* have been discovered in my research. I see no distinction between pornographic magazines and pornographic movies that would take this case outside the holding in *Gurley.*

If the Court were writing upon a clean slate, the wisdom of adopting the reasoning in *Gurley* would be the subject of vigorous debate. Whenever a court leaves the well-defined path of determining legal questions and undertakes to define moral issues, it embarks upon a journey through a Serbonian bog.

This Court has not overruled *Gurley.* So long as *Gurley* stands, we are bound thereby.

Chief Justice BRANCH joins in this concurring opinion.

Justice EXUM dissenting.

The majority holds it was not reversible error to permit a testifying defendant in a sex offense case to be cross-examined about watching a sexually explicit movie that depicted the same kind of acts with which defendant was charged. Defendant, willingly accompanied by someone of the opposite sex, viewed this movie in the privacy of his motel room five days after commission of the crimes with which he was charged. Believing that this cross-examination should not have been permitted, was highly inflammatory, and contributed to the verdict against defendant, I respectfully dissent.

I.

Unlike the majority, I believe the issue of defendant's guilt is close. This view colors my assessment of the impact of the challenged evidence.

The majority places great weight upon the victim's "unequiv-ocal identification" of defendant *in court*, but attempts, I fear, to "paper over" equivocal identification efforts of the victim in pretrial identification sessions during which she saw defendant's photograph. During the first photographic array, which included defendant's picture, the victim made no identification. Less than twenty-four hours later, she saw the photographs again and could say only that defendant's picture made her feel sick. She did *not* identify him, tentatively or otherwise, as her assailant. At a live line-up almost a month later,[1] the victim identified defendant.

In determining what effect the challenged cross-examination had on the trial's outcome, we should view the victim's identifica-tion as a process — from her initial description through the pre-trial identification proceedings to the testimony in the courtroom. Although her in-court identification was unequivocal, and I think admissible, despite a reasonably strong argument that it was ir-reparably tainted by unduly suggestive pretrial procedures, the victim's equivocal performance at these other procedures must detract from the strength of her in-court identification.

Even so-called "unequivocal" eyewitness identification espe-cially when it functions as the nearly exclusive evidence of guilt, must be viewed carefully. *United States v. Holley*, 502 F. 2d 273, 274-75 (4th Cir. 1974); *United States v. Telfaire*, 469 F. 2d 552, 555-56 (D.C. Cir. 1972). Often recollections by victims are wrought with uncertainty and susceptible to suggestion. Identifications, especially by victims suffering from the shock and horror of their experiences, deserve particular scrutiny. Errors may all too readi-ly plague their memories. *See generally* 3 Wigmore on Evidence § 786(a) (Chadbourn rev. 1970). "The vagaries of eyewitness iden-tification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 U.S. 218, 228 (1967).

---

1. Between the times she viewed the photographs and the live line-up, the vic-tim underwent hypnosis in an effort to see if she could recall why defendant's photograph bothered her. Although defendant assigns no error dealing specifically with this hypnotic session, it underscores the dramatic change in the victim's abili-ty to identify defendant as her assailant between the two photographic procedures and the line-up, not to mention the in-court identification. The victim's assertion at trial that no new information developed from the hypnotic session hardly assuages any lingering doubts as to the positiveness of her identification.

The upshot is that I cannot subscribe to the majority's heavy reliance on the victim's identification as supportive of a conclusion that the evidence against defendant was overwhelming.

The majority next refers to the "results of blood tests [which] pointed to defendant as the perpetrator of the crime." Suffice it to say simply that these results mean only that defendant, along with a large portion of the population, could have committed the crime. A number of states do not permit such evidence because they conclude it has little, if any, probative value. *State v. Gray,* 292 N.C. 270, 282, 233 S.E. 2d 905, 913-14 (1977). We do admit it, but we have also recognized that its probative value is slight. *Id.* at 283, 233 S.E. 2d at 914.

The majority finally notes that "clothes matching those worn by the assailant were discovered in defendant's locker." This statement obscures the fact that the items seized did not match precisely those attributed to the assailant. He allegedly wore navy blue jogging shorts and Nike tennis shoes. While two similar items were found in defendant's locker, they are hardly unique items of clothing. Furthermore, defendant's shorts had white stripes and his Nike shoes were laced with black shoestrings, the latter being a relatively unusual fact which was never mentioned in the victim's description, although she did notice and mention a "black swirl on the side of the tennis shoes."

Finally, on the closeness of the case question, I note the majority simply ignores defendant's considerable evidence supporting an alibi. Defendant was a lance corporal in the United States Marine Corps. He testified that at 11 p.m. on the evening during which the crime occurred he was in his "rack." Since he was scheduled for "mess duty" the next morning, he was due to be awakened at 2:45 a.m. Actually he was awakened sometime after 3 a.m., but he could not recall the exact time, or who woke him. He was at "chow hall" for roll call at 4 a.m., the time he was scheduled to be on duty.

This testimony gains crucial significance due to the victim's explicit testimony that the perpetrator was in her apartment from 3 a.m. until 4:15 a.m. by the clock. Defendant could not, of course, have been in both places simultaneously.

Considerable credible testimony[2] supported defendant's contentions. First Lieutenant Peter D. Lloyd, commander of defendant's platoon, confirmed that defendant was assigned "mess duty" for the morning in question and that defendant should have been awakened at 3 a.m. to be at "chow hall" at 4 a.m. He testified further that, had defendant not been at "chow hall" at that time, he would have been "written up" for an unauthorized absence. Lieutenant Lloyd confirmed that defendant had not been cited for an unauthorized absence on that day. Corporal Reubin Pitts, the non-commissioned officer in charge of defendant's squad, testified that he was awakened at 3:30 a.m. on the day in question and he woke defendant at 3:30 a.m. He actually touched defendant in waking him. Defendant was wearing white trousers and a T-shirt. He was certain also that defendant came to "chow hall" at 4 a.m. Private Brett James Crawford, who admitted having had "a difference" with defendant, and who, like defendant, had mess duty on 21 July, testified that he "pulled the covers off" defendant to try to wake him sometime between 3:30 and 4 a.m. on that day. He recalled seeing defendant at the mess hall shortly after he, the witness, left the barracks at 3:50 a.m. and working with him in the mess hall that morning. Finally, Lance Corporal William L. Tally, a chaplain's assistant, testified that he saw defendant in a recreation room in the upstairs of the barracks around 11 p.m. the night of the crime. He also saw defendant in his "rack" at 3:30 a.m. and on his way to "chow hall" at 3:50 a.m. on the morning of the attack.

As this brief review indicates, considerable evidence supported defendant's alibi. The majority curiously and inexplicably ignores it. The quantity and quality of this evidence makes defendant's case on its face at least as strong as that of the state. This alone makes the question of defendant's presence at the scene and therefore his guilt close indeed. I find the majority's contrary position to be unsupported by the record.

## II.

The challenged cross-examination was admitted for the purpose of impeaching defendant's credibility as a witness. For this

---

2. Three of the four witnesses who corroborated defendant's account described themselves as merely acquaintances, not close friends, of defendant.

evidence to be admissible it must first be relevant to the issue of defendant's credibility; second, even if relevant, its prejudicial effect must not outweigh its probative value. The evidence meets neither standard.

The basic test of relevance is that the evidence have a logical tendency to prove a fact in issue. *See State v. Swift*, 290 N.C. 383, 226 S.E. 2d 652 (1976). *See generally* Fed. R. Evid. 401.[3] If the proffered evidence does not make a fact in issue more or less probable, it is not relevant.

The fact in issue for which the evidence below was offered was defendant's credibility. As the majority notes, the prosecution used the evidence only to impeach defendant. To be permissible, an attempt to impeach a witness's credibility should test his propensity for telling the truth. That a person may watch a sexually explicit movie in the privacy of a motel room with someone of the opposite sex has no bearing, *i.e.*, is not relevant, on the question of that person's propensity to tell the truth. That such conduct may be morally offensive to some (although certainly not all) people, does not imbue it with a logical tendency to prove or disprove a propensity for truthfulness. Support for this conclusion may be found in the federal rule which permits the impeachment of a witness's credibility by evidence referring "only to character for truthfulness or untruthfulness," Fed. R. Evid. 608(a), a rule which our legislature has adopted, effective 1 July 1984. An Act to Simplify and Codify the Rules of Evidence, Chap. 701, 1983 Sess. Laws, Rule 608(a).

Our case law retains the notion that a witness, even the defendant in a criminal case, may be impeached "by asking disparaging questions concerning collateral matters relating to his criminal and degrading conduct." *State v. Williams*, 279 N.C. 663, 675, 185 S.E. 2d 174, 181 (1971). Nevertheless, we have never said precisely what sort of conduct rises to the level of "criminal and degrading." In the vast majority of cases, the conduct consisted of an *illegal, i.e.*, criminal act. *See, e.g., State v. Leonard*, 300 N.C.

---

3. Our new evidence code, 1983 N.C. Adv. Legis. Serv. c. 701, adopts the federal standard for relevancy which includes "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

223, 266 S.E. 2d 631, *cert. denied,* 449 U.S. 960 (1980) (killing); *State v. Herbin,* 298 N.C. 441, 259 S.E. 2d 270 (1979) (rape); *State v. Williams,* 292 N.C. 391, 233 S.E. 2d 507 (1971) (robberies); *State v. Mack,* 282 N.C. 334, 193 S.E. 2d 71 (1972) (assault and sodomy); *State v. Sims,* 213 N.C. 590, 197 S.E. 176 (1938) (gambling). I am confident that the phrase "criminal and degrading conduct," as used in *Williams,* means that the conduct must amount either to a violation of the criminal law[4] or to acts involving deceit, fraud, or trickery. While the conduct herein may be tasteless and morally wrong to many of us, it is neither a crime nor an act bearing on defendant's truthfulness. Its use, therefore, for impeachment purposes constitutes error.

The majority refers to a number of cases for the proposition that "disparaging conduct" may be used to impeach a witness. I concede there is loose language in some of the cases which tends to support the "disparaging conduct" rationale for admissibility, but there are no holdings which support the rationale. I think it is time, therefore, for this Court to reject "disparaging conduct," whatever it may encompass, as a test for admissibility of impeaching acts.

First, *State v. Gurley,* 283 N.C. 541, 196 S.E. 2d 725 (1973), from which Justice Martin and Chief Justice Branch get comfort, does not control the issue. Although the Court there did permit a testifying defendant to be cross-examined by questions regarding "his possession of, familiarity with and interest in [pornographic magazines] for the purpose of impeachment," the Court never characterized this conduct as "disparaging" or as "misconduct" and never stated that it tended to impeach defendant by way of showing his bad character. *Id.* at 547, 196 S.E. 2d at 729. The Court did not cite or otherwise rely on any of our cases establishing the rule that a testifying defendant may be cross-examined about specific acts of misconduct to show his bad character on the question of his overall credibility as a witness. Indeed, the Court in *Gurley* cited no cases for its conclusion and

---

4. As I point out in Section III, *infra,* the essence of impeachment is to probe the witness's credibility by testing his propensity for truth and veracity. *See* Fed. R. Evid. 608. Thus, even acts not necessarily criminal which reflect on a witness's tendency toward untruthfulness, *e.g.,* lying, fraud, or trickery, would be admissible for impeachment purposes. The acts involved in this case, however, have no relation to defendant's propensity for truth and veracity.

treated the question quite perfunctorily. Yet in the next suc-
ceeding paragraph the Court dealt at some length with the pro-
priety of cross-examining defendant about his prior criminal
activities, citing several cases for the proposition that a defendant
"may be questioned as to particular acts impeaching his
character." *Id.*

To understand why the Court so perfunctorily treated the
pornographic magazine cross-examination in *Gurley,* one need
only examine the facts in that case. This examination makes clear
that the Court did not allow the cross-examination for the pur-
pose of impeaching defendant by way of showing his bad char-
acter. Rather, it allowed the cross-examination on the substantive
issue of Gurley's identity as the assailant for the purpose of im-
peaching Gurley's testimony that he had never seen the victim
and had not raped or kidnapped her.

The record in *Gurley* reveals that the victim testified that
her assailant "showed me a few magazines of his that were full of
nude girls and stuff. Magazines with nude girls . . . a pile of them
. . . on his nightstand. He showed me a couple of them." She said
her assailant told her that she "belonged in them, in reference to
a statement concerning my body." She said her assailant ex-
hibited these magazines and made this statement during the two-
to three-hour period in which he detained and repeatedly raped
her. She identified five magazines marked state's Exhibit 11 as
"similar to" the ones defendant showed her. Gurley, testifying in
his own behalf, stated that he had never seen the victim and
denied any involvement in her rape or kidnapping.

Thus the reason for the propriety of the pornographic mag-
azine cross-examination in *Gurley* becomes obvious. Defendant's
possession of, familiarity with and interest in pornographic
magazines was one of the facts which tended to identify him as
the victim's assailant. The Court in *Gurley* noted in its statement
of facts that after the victim was released by her assailant she
reported the matter immediately to the police "including a full
description of her assailant, of the cloth used as a blindfold, of
guns, of bed covers and of pornographic magazines observed by
her in the apartment to which she was taken . . . ." *Id.* at 544,
196 S.E. 2d at 727. Thereafter, a deputy sheriff went to the apart-
ment described by the victim, found the defendant there together

with a number of articles the victim had described, including the pornographic magazines. All of these articles, with the exception of the pornographic magazines, were admitted and exhibited to the jury. The Court further noted in its recitation of the facts in *Gurley* that defendant on cross-examination "acknowledged that the pornographic magazines had been in his apartment and that he was familiar with them. He described their contents in some detail." *Id.* at 544, 196 S.E. 2d at 728. For some reason, not apparent in the record, the trial court sustained defendant's objection to the introduction only of the magazines.

Thus, the pornographic magazine cross-examination in *Gurley* tended to identify Gurley as the victim's assailant. It did indeed tend to impeach his denial of his guilt, not by way of showing his bad character, but by way of showing that he, like the victim's assailant, possessed and had an interest in pornographic magazines.

I note, too, that at trial Gurley, for obvious reasons, raised no objections to the pornographic magazine cross-examination as he had not objected to the victim's description of her assailant as one who possessed and was interested in such literature.

Moreover, *Gurley,* unlike the case at bar, was not a close case on its facts. The Court in *Gurley* noted:

> In view of the overwhelming evidence presented by the state of unquestioned competence, any error in the admission of the evidence of which [defendant] now complains, assuming timely objection had been made, would clearly have been harmless error.

*Id.* at 548, 196 S.E. 2d at 730.

Finally, if *Gurley,* so long as it stands, should be thought to control, then, believing that *Gurley* is not sound law on this point, I would urge the Court to overrule this aspect of it.

The majority refers to *State v. Lynch,* 300 N.C. 534, 268 S.E. 2d 161 (1980), as being supportive of admissibility. The conduct at issue in *Lynch* was the defendant's having called the district attorney a "punk" and mouthed the word "mother" as defendant passed counsel's table during trial. This kind of conduct demonstrated defendant's contempt for the process of the trial itself and

an officer of the court charged with conducting that process. Arguably, therefore, it bears on the issue of defendant's credibility as a witness in that process.

Other cases referred to by the majority as supportive of admissibility are readily distinguishable. *Sparks*, 307 N.C. 71, 296 S.E. 2d 451, relied on the prosecutor's failure to address his cross-examination to a *specific act* of misconduct; it did not alter the definition of "criminal and degrading conduct." Because the question was framed improperly, the Court had no occasion to face the issue of whether defendant's conduct itself could be used for impeachment purposes. Likewise, *Small*, 301 N.C. 407, 272 S.E. 2d 128, involved a defendant's being cross-examined about sexual acts with women other than defendant's wife. Adultery is a form of deceit. Arguably, one who commits it is not as prone to be truthful as one who remains faithful to his or her spouse. But the critical fact in *Small* was the state's initial introduction, without objection, of that same evidence in its case in chief for substantive purposes to show defendant's motive for killing the victim who was his wife. Finally, *Lester*, 289 N.C. 239, 221 S.E. 2d 268, involved inquiry into defendant's dishonorable discharge. But the record reveals that defendant *voluntarily* indicated that he was discharged because he had been "busted for drugs." Thus, *Lester* stands for nothing more than the acceptability of impeachment by cross-examination on prior criminal acts.

When we permit impeachment by acts which we consider merely "disparaging," we risk encompassing conduct which some might simply consider immoral, or in bad taste, or merely "bad manners." The legislature has not prohibited watching even obscene movies; it proscribes only their dissemination. N.C. Gen. Stat. § 14-190.1(a). Our Court of Appeals has concluded that one cannot be constitutionally prosecuted for occupying a motel room for "immoral purposes" for the very reason that a court cannot properly determine what is and is not "immoral."

> G.S. 14-186 fails to define with sufficient precision exactly what the term 'any immoral purpose' may encompass. The word *immoral* is not equivalent to the word *illegal*; hence, enforcement of G.S. 14-186 may involve legal acts which, nevertheless, are immoral in the view of many citizens. One must necessarily speculate, therefore, as to what acts are immoral.

*State v. Sanders*, 37 N.C. App. 53, 55, 245 S.E. 2d 397, 398 (1978). To some people being in a motel room with someone of the opposite sex to whom you are not married or watching a sexually explicit movie with or without that person may be "disparaging conduct." To others not. Truly, as the Supreme Court itself has noted, "one man's vulgarity is another's lyric." *Cohen v. California*, 403 U.S. 15, 25 (1971). To read and see such critically acclaimed books and movies as, for example, *Lady Chatterly's Lover, Tropic of Cancer*, "Midnight Express" (depicting masturbation, homosexuality, and sadism), and "Last Tango in Paris" (depicting sodomy per anus) might be considered "disparaging conduct" to some. Yet this Court would not, nor should it, conclude that reading or seeing these works is "disparaging conduct" by which a witness's credibility can be impeached. Defendant's conduct at issue here seems no worse than this.

This, then, is the kind of quagmire into which we plunge when we refuse to reject acts which we consider merely "disparaging" as material for impeachment. A better rule which I wish this Court would adopt in this case is that a specific act used to impeach a witness must be either illegal, deceitful, or show contempt for the very process by which the defendant is being tried. *See State v. Black*, 308 N.C. 736, 303 S.E. 2d 804 (1983) (where the Court assumed that cross-examination of defendant about his prior employment at an adult bookstore was objectionable). Defendant's conduct, however offensive it might be to some, is neither legally wrong nor dishonest, nor does it demonstrate contempt for the legal process; it should not, therefore, be available for impeachment purposes. Simply stated, it bears no relevance to that issue.

### III.

Even if this evidence passes the test of relevancy, I find its probative force to be greatly outweighed by its potential for inflaming the jury against defendant accused of sex offenses.[5]

5. Our common law evidence rule requiring this balancing has never been clearly articulated. *See State v. Stone*, 240 N.C. 606, 83 S.E. 2d 543 (1954); *State v. Brantley*, 84 N.C. 766 (1881). *See also*, 1 Brandis on N.C. Evidence § 80, pp. 295-96 (1982). In its adoption of an evidence code, effective 1 July 1984, the legislature followed precisely the applicable federal rule. Our new code provides that evidence,

The majority acknowledges that the sexual acts depicted in the movie "were the same type of sexual acts that had been forced upon the victim five days earlier." This renders the evidence inflammatory and inclines the jury to decide the case on an improper basis. The evidence's effect is all too clear. The jury hears that defendant was in a motel room, five days after the crime in issue, viewing with a girl friend a movie which depicts sexual acts similar to those with which defendant is charged. The jury improperly concludes not only that defendant has similar sexual desires but that he is disposed forcefully to satisfy them upon an unwilling victim. It is then a short step to the next conclusion that defendant is in fact the perpetrator of the crimes charged.

More generally, evidence of a defendant's bad acts always tends to draw a jury's attention from the real issues. *United States v. Bledsoe,* 531 F. 2d 888, 891 (8th Cir. 1976). The damaging force of such evidence is that it inclines the jury to convict simply because it disapproves of a defendant as a person. *See State v. Ervin,* 340 So. 2d 1379, 1381 (La. 1976).

The majority asserts that the introduction of this evidence, even if error, created no reasonable possibility that had it been excluded a different result would have been reached at trial. For the reasons set out in part I of this dissent, I strongly disagree.

The majority fails to note defendant's considerable evidence of an alibi. Contrary to the impression created by the majority, this case, as I have already shown, was close on the question of defendant's presence at the scene and consequently his guilt of the crime. The likelihood of prejudice, therefore, flowing from the admission of the challenged cross-examination is so enhanced that a reasonable possibility does exist that a different result would have obtained had the evidence been excluded.

---

although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or misleading the jury . . . ." *Compare* N.C. Gen. Stat. § 8C-1, Rule 403, *with* Fed. R. Evid. 403. The federal rule requires exclusion if the evidence creates "an undue tendency to suggest decision on an improper basis." M. Graham, Handbook of Federal Evidence § 403.1 (1981). The evidence admitted below suggests just the sort of improper basis contemplated by this rule.

IV.

When such prejudicial evidence is admitted, defendant's right to a fair trial, etched in any notion of basic due process and fundamental fairness, is jeopardized. *See* Comment, *Impeachment of the Criminal Defendant by Prior Acquittals—Beyond the Bounds of Reason,* 17 Wake Forest L. Rev. 561, 591-95 (1981) (hereinafter *Impeaching the Testifying Defendant*). Based upon its overwhelmingly prejudicial effect alone, the evidence should have been excluded.

I am concerned by an inescapable effect transcending this case of the admission of this kind of evidence. It involves a defendant's decision whether to testify. When allowing impeachment of a testifying defendant, we must recognize that he possesses a statutory, if not a constitutional, right to testify. N.C. Gen. Stat. § 8-54 (1981); *Impeaching the Testifying Defendant, supra,* at 587-89; Bradley, *Havens, Jenkins and Salvucci, and the Defendant's Right to Testify,* 18 Am. Cr. L. Rev. 419, 420-23 (1981). Courts must zealously guard important rights, like the right to testify in defense of oneself. If we continue to refuse to reject irrelevant and unduly prejudicial evidence to be introduced on cross-examination under the guise of "character impeachment", defendants who might otherwise truthfully testify in their own defense will be improperly discouraged from exercising their right to do so. We should reject unjustified interpretations of evidentiary principles which impinge on this important right.

V.

I further dissent from the majority's conclusion that defendant was not entitled to the victim's prior statement when she testified on voir dire during the trial. I recognize that our recent decision in *State v. Williams* suggests the route taken by the majority. 308 N.C. 357, 302 S.E. 2d 438 (1983). It does not, however, compel this result; and I do not think it should be so extended.

We have held that prior statements of prosecution witnesses are not discoverable before trial. *State v. Hardy,* 293 N.C. 105, 122-24, 235 S.E. 2d 828, 838-39 (1977). That holding did not indicate that it should extend to pretrial hearings. In *Williams,* however, we extended the *Hardy* rule to pretrial hearings. 308 N.C. at 361,

302 S.E. 2d at 441. In retrospect, I am now troubled by our conclusion in *Williams*.

Our rationale for protecting prior statements of prosecution witnesses from pretrial discovery by the defense hinges on the need not to disclose their identity unnecessarily. We recognized the legislature's concern with this problem and the protection it accorded the identity of the state's witnesses in *Hardy*, 293 N.C. at 124, 235 S.E. 2d at 839 (noting legislative commentary to the criminal discovery statutes). Obviously, this justification fails to support nondisclosure of witnesses' statements once they testify at a voir dire hearing, either before or during trial. We did not analyze the issue carefully in *Williams*, as we noted only that any impeachment value of a former statement went to the weight rather than the admissibility of the witness's identification. 308 N.C. at 361, 302 S.E. 2d at 441. Impeachment value of a former statement, however, is nearly as important during a voir dire before the judge as it is during trial before the jury. The judge must assess the credibility of witnesses in rendering his judgment as to the admissibility of the evidence which is the subject of the voir dire. There is, therefore, no reason not to provide defendant with prior statements of witnesses who testify during voir dire and there are good reasons for providing them. A voir dire, no less than the trial itself, is a search for the truth. Insofar as prior statements shed light on this search, they should be available in both proceedings.

It is true, as the majority notes, that the legislature did prevent discovery of pretrial statements of a witness "until that witness has testified on direct examination in the trial of the case," N.C. Gen. Stat. § 15A-903(2). The legislature did not, as the majority states, refer to the trial "before a jury." I believe the construction of the statute which best accords with the legislative intent is that testifying "in the trial of the case" means testimony during any public judicial proceeding, whether before a judge on voir dire or a jury on the question of guilt, where the witness testifies concerning matters on which he or she has made a prior statement.

Here, of course, the voir dire took place *during the trial,* although out of the jury's presence. Assuming *Williams* was correctly decided on its facts, I would not extend *Williams* to voir

dires conducted during the trial of a case, *i.e.*, after the jury has been empaneled.

Given the content of the witness's prior statement, I do not believe it would have aided defendant in any way during the voir dire. Since the nondisclosure was not prejudicial in this case, it would not, standing alone, entitle defendant to a new trial.

Only because of the improper "impeachment" of defendant on cross-examination do I vote for a new trial.

Justice FRYE joins in this dissenting opinion.