IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-496

No. COA20-476

Filed 21 September 2021

Wilson County, No. 17 CRS 53541

STATE OF NORTH CAROLINA

v.

JALEN TIWAYNE BRAKE

Appeal by defendant from judgments entered 2 October 2019 by Judge Marvin

K. Blount III in Wilson County Superior Court.  Heard in the Court of Appeals 25

August 2021.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General M. Denise Stanford, for the State.*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Daniel K. Shatz, for defendant-appellant.*

TYSON, Judge.

Jalen Tiwayne Brake ("Defendant") appeals a jury's verdict finding him guilty

of first-degree forcible rape and second-degree forcible sexual offense and claims the

two convictions are inconsistent and contradictory.  We find no error.

## I.  Background

"B.J." traveled to Wilson, North Carolina on 7 October 2017 to attend a trail

ride (the parties agree to use of a pseudonym to protect the identity of the

complainant).  The trail ride included an event with tents, concessions, and dancing. B.J. attended the trail ride with her friends, Kristen Johnson, Tara Beaver, and Tara's daughter.  B.J. admittedly consumed "a significant amount" of vodka during the three-hour drive enroute to the trail ride.  The four women arrived in Wilson between 9:00 p.m. and 11:00 p.m.  B.J. was intoxicated.

¶ 3     The four women went to the dance floor when they arrived.  A disc jockey was playing music and some attendees were dancing.   The four women met with Darius Tysor, a friend of both Tara and Kristen.

¶ 4     Defendant, who had recently turned sixteen, was attending the trail ride with his family.  Defendant testified he had consumed four or five shots of corn liquor and four beers that evening.  Defendant was present on the dance floor and testified B.J. was drunk, and "she was falling all up on me, grabbing on me . . . and she was just pushing her body up against me and everything."

¶ 5     After some time, Tara, Kristen, and Darius went to their car to get water, leaving B.J. on the dance floor with Defendant.  B.J. testified she danced with Defendant and then "walked off with him," but she could not recall "why."  Defendant and B.J. walked far enough away that they were not within eyesight of the dance floor.

¶ 6     B.J. testified Defendant became physically forceful with her.  He got on top of her, kissed her, and "tr[ied] to do stuff."  B.J. testified, "he kept being really forceful

so I just remember thinking in my head, [B.J.], just relax, sit back and act like you're going to be okay so you can kind of catch him off guard and I kicked him."

¶ 7        B.J. told Defendant "no" and to "stop," and she kicked him and punched at him. Defendant stood up. B.J. thought the incident was over, so she started to stand up. When B.J. got onto her knees, Defendant hit her in the face and the back of her head.

¶ 8        B.J. testified, "I was on my knees and he was standing over me just like pummeling my head. I was crying. He kept telling me to shut the f**k up, bitch, don't, stop crying." B.J. continued, "I thought he was going to break my teeth out . . . I didn't know if he was going to hit me in just the wrong spot and it was going to kill me."

¶ 9        Defendant stopped hitting B.J., pulled his pants down and inserted his penis into her mouth. Defendant told B.J. if she bit him, he would "f**k**g kill" her. Defendant repeated this warning several times. B.J. testified, "at that point I just decided to stop fighting because I didn't want him to kill me . . . I've never experienced anything like it. And I was just terrified." She stated Defendant was not "all the way erected" when his penis was thrust into her mouth.

¶ 10        Defendant pushed B.J. onto the ground upon her back, he removed her pants, boots, and underwear and got on top of her. B.J. was not sure if Defendant fully penetrated her, but testified she could feel the pressure. Defendant then stood up, pulled his pants halfway up, pulled his belt around, and walked away towards the

tent area.

¶ 11   B.J. arose from the ground.  She put on her pants but left off her boots.  She walked to the dance floor to find a law enforcement officer.  B.J. found deputies and told them she had been assaulted.  She was taken to the hospital in an ambulance.

¶ 12   B.J.'s injuries were photographed at the hospital.  These photographs showed her face was swollen and bruised.  The photographs also documented redness on the back of her head from being repeatedly hit, a scratch on her right arm, swelling of her left arm from blocking Defendant's blows, scratches on her back and thighs, and redness on her knees.  While at the hospital, B.J. was administered a rape kit, samples were collected, and she was examined by a physician.

## A.  Darius Tysor's Testimony

¶ 13   Darius testified he went to the trail ride to meet with Tara and Kristen.  Darius did not drink because he had planned to drive the four women home.  Darius met the four women on the dance floor when they arrived.  When Tara and Kristen went to the car to get water, Darius went with them.  Darius noticed B.J. was dancing with Defendant as the group walked away from the dance floor.  When the group returned to the dance floor, B.J. and Defendant were gone.

¶ 14   Darius and Kristen looked for B.J. around the campground.  The next time they saw B.J., she was walking towards the deputies on the side of the dance floor.  Darius testified B.J. looked like she had been beat up and was hysterical.  Darius

said B.J. was not wearing her boots.

Darius and Kristen looked for B.J.'s boots and found them lying beside a fence about 100 to 150 yards from the dance floor. After they found the boots, they began to look for Defendant.

## B. Kristen Johnson's Testimony

Kristen Johnson testified she recalled seeing B.J. dance with Defendant. B.J. asked for water, so the group left B.J. on the dance floor and went to the car. When they returned, B.J. was no longer on the dance floor.

Kristen testified that she and Darius began looking for B.J. and Defendant. Kristen testified the next time she saw B.J. it was about 20-30 minutes from the last time she had seen her. Kristen testified she saw B.J. with some deputies, and Kristen "started freaking out because I could see her face so I went up to her and I said, who did this to you. I thought she had got (sic) jumped, her injuries were so bad." Kristen said B.J. was crying and replied, "He did it." When deputies asked if B.J. had been seen, or had danced with any other men that night, Kristen stated B.J. had not.

Kristen and Darius spoke with Defendant's uncle who took them to the tent where Defendant was located. Kristen observed Defendant was face down in the tent and he appeared to be "passed out." Defendant had dirt and grass on the back of his shirt. Defendant's pants were down around his knees.

## C. Deputy Moore's Testimony

¶ 19        Wilson County Sheriff's Deputy Shonday Moore ("Deputy Moore") was working security at the trail ride on 7 October 2017. Deputy Moore was standing near the dance floor with some other officers when he saw B.J. a little after midnight. Deputy Moore testified B.J. was staggering towards them and appeared to have been involved in an altercation. B.J. had swollen facial features and grass stains all over her clothes. B.J. reported she had been assaulted.

¶ 20        Deputy Moore noticed that B.J.'s pants were unzipped, and she was not wearing any shoes. B.J. had grass stains on her socks and clothes and had grass in her hair as well. Deputy Moore asked if "things went further," and B.J. said that she did not know if penetration had taken place, but she told Deputy Moore the subject had tried, but she was unsure of the extent of the assaults. B.J. described her attacker as a black male with short, dreadlock-like style hair.

¶ 21        Deputy Moore testified B.J. was "tore all to pieces," very upset, became hysterical and started to hyperventilate. The prosecutor asked Deputy Moore at trial, "did [B.J.] tell you whether or not she fought back or not?" Deputy Moore replied, "She did tell me that she did fight back. She said she was fighting back but it wasn't working."

### D. Detective Jackson's Testimony

¶ 22        Wilson County Sheriff's Detective Julie Jackson ("Detective Jackson") was called to the hospital where B.J. was taken to investigate her assault. Detective

Jackson arrived at the hospital shortly after 1:20 a.m. and interviewed B.J.

B.J. told Detective Jackson the "individual that she was on the dance floor with was the subject she walked away with and went to the woods with." B.J. told Detective Jackson about the altercation and the subject had "possibly tried to penetrate her but she was unsure if penetration was made."

Defendant was arrested and transported to the sheriff's department. Detective Jackson went to the sheriff's office and collected an oral DNA swab from Defendant.

## E. DNA Evidence

A registered nurse collected various samples from B.J. for the rape kit while B.J. was at the hospital. One sample was a vaginal swab.

April Perry ("Perry"), a forensic scientist and body fluid analyst at the North Carolina State Crime Laboratory, testified at trial. Perry testified she examined the smear associated with the vaginal swabs under a microscope and identified sperm on the slide. Perry stated she forwarded the smear for DNA analysis. Perry noted that the sperm she had observed on the smear were intact with the tails still attached, indicating they had been deposited into the vagina less than 12 to 24 hours prior.

Erin Wolfe ("Wolfe"), a forensic scientist at the North Carolina State Crime Laboratory, testified as an expert in DNA analysis. Wolfe was assigned to perform the DNA analysis for B.J.'s vaginal swabs and Defendant's known blood sample. Wolfe's analysis determined the major contributor profile of the DNA from the swab

sample obtained from inside B.J.'s vagina at the hospital matched the Defendant's DNA profile.

### F. Detective Rouse's Testimony

¶ 28    Wilson County Sheriff's Detective Michael Rouse ("Detective Rouse") interviewed Defendant around 1:00 a.m. on 8 October 2017. Detective Rouse asked Defendant if there was any reason Defendant's DNA would be anywhere on the victim. Defendant said no, and he denied having sexual intercourse with anyone that night.

### G. Defendant's Testimony

¶ 29    Defendant testified he had danced with B.J. on the dance floor. He stopped dancing with her and walked away. Defendant claims B.J. returned and started dancing with him again. Defendant and his friends discussed how B.J. was pressing against him on the dance floor. Defendant testified he left the dance floor by himself and went to his tent.

¶ 30    Defendant further testified B.J. subsequently went into Defendant's tent with his friend, Stephon. Defendant claims he and B.J. had consensual sex. B.J. left the tent and walked off with Stephon. Defendant then went to sleep. Stephon did not testify at trial.

## II.    Procedural history

¶ 31    Defendant was indicted for one count of first-degree forcible rape under N.C.

Gen. Stat. § 14-27.21, one count of first-degree forcible sexual offense under N.C. Gen. Stat. § 14-27.26, and one count of misdemeanor assault inflicting serious injury under N.C. Gen. Stat. § 14-33(c)(1). Prior to trial, the State dismissed the misdemeanor charge.

At trial, after the conclusion of the State's evidence, defense counsel moved to dismiss Defendant's charge of first-degree forcible rape. This motion was denied. Counsel renewed this motion at the conclusion of all evidence. This motion was also denied.

The jury returned verdicts and found Defendant guilty of first-degree forcible rape and second-degree forcible sexual offense. The trial judge sentenced Defendant to a term of active imprisonment of 240 to 348 months for the first-degree forcible rape conviction and 73 to 148 months imprisonment for the second-degree forcible sexual offense, with the sentences to run concurrently. Defendant appealed.

### III.   Jurisdiction

This appeal is properly before this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b)(1), 15A-1444(a) (2019).

### IV.   Issue

Whether the trial court erred by accepting the jury's verdicts finding Defendant guilty of first-degree rape and second-degree sexual offense when the former verdict requires the jury to find Defendant inflicted serious injury on the

prosecuting witness and the latter verdict does not.

## V.     Standard of Review

¶ 36          Where a defendant asserts an issue of inconsistent verdicts, the standard of review is *de novo*. *State v. Blackmon*, 208 N.C. App. 397, 403, 702 S.E.2d 833, 837 (2010).

## VI.     Analysis

¶ 37          Defendant asserts the jury's verdicts finding him guilty of first-degree rape and second-degree sexual offense are inconsistent and contradictory.  "[A] distinction is drawn between verdicts that are merely inconsistent and those which are legally inconsistent and contradictory." *State v. Mumford*, 364 N.C. 394, 398, 699 S.E.2d 911, 914 (2010).  "It is firmly established that when there is sufficient evidence to support a verdict, mere inconsistency will not invalidate the verdict." *Id*. (citation and internal quotation marks omitted). "[W]hen a verdict is inconsistent and contradictory, a defendant is entitled to relief." *Id*. (citation omitted).

¶ 38          Our Supreme Court has long held: "If two statutes are violated even by a single act and each offense requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the one statute." *State v. Birckhead,* 256 N.C. 494, 500, 124 S.E.2d 838, 843 (1962) (alterations, citations and internal quotation marks omitted).

## A. Indictments and Jury Verdicts

¶ 39     Defendant was indicted for first-degree forcible rape under N.C. Gen. Stat. § 14-27.21 and for first-degree forcible sexual offense under N.C. Gen. Stat. § 14-27.26.

¶ 40     The elements of first-degree forcible rape require the jury to find the defendant: (1) engaged in vaginal intercourse with another, (2) by force, (3) against the will of the other person, and (4) inflicted serious personal injury upon the victim. N.C. Gen. Stat. § 14-27.21(a) (2019).  The elements of second-degree forcible rape involve the first three elements of first-degree rape, but not the fourth element of serious personal injury. N.C. Gen. Stat. § 14-27.22(a) (2019).

¶ 41     The elements of first-degree forcible sexual offense are: (1) engaged in a sexual act with another, (2) by force, (3) against the will of the other person, and (4) inflicted serious personal injury upon the victim. N.C. Gen. Stat. § 14-27.26(a) (2019).  The elements of second-degree forcible sexual offense involve the first three elements of first-degree forcible sexual offense, but not the fourth element of serious personal injury. N.C. Gen. Stat. § 14-27.27(a) (2019).

¶ 42     Injuries to constitute "serious personal injury" have been held to include: "a bruised and swollen cheek, a cut lip, and two broken teeth." *State v. Jean*, 310 N.C. 157, 170, 311 S.E.2d 266, 273 (1984).

¶ 43     Defendant argues that based upon the jury instructions, if the jury determined that Defendant had inflicted serious injury on B.J., the jury should have rendered

verdicts of guilty of first-degree forcible rape and first-degree forcible sexual offense.

¶ 44       Defendant minimizes B.J.'s physical injuries sustained as a result of Defendant's assaults. B.J.'s injuries were photographed and documented by medical professionals and testified to by several witnesses and law enforcement. Further, a conviction of second-degree forcible sexual offense does not require evidence and a finding of inflicting serious injury. *See* N.C. Gen. Stat. § 14-27.27(a). Defendant's argument has no merit.

## B. Two Counts Supported by Two Separate Acts

¶ 45       B.J. testified to the violence of Defendant's attacks as she tried to stand up after Defendant tried to kiss her while laying on top of her upon the ground, "I remember like where he was hitting me I thought he was going to break my teeth out or something. I didn't know if he was going to hit me in just the wrong spot and it was going to kill me."

¶ 46       Defendant thrust his penis into B.J.'s mouth with threats of further violence to "kill" her, if she bit him. As B.J. testified, it was apparent to her at the beginning of the assault Defendant was unable to insert his penis because he did not have an erection. After Defendant removed his penis from B.J.'s mouth, he pushed her onto the ground, removed her jeans, boots and underwear, and attempted to thrust his penis into her vagina.

¶ 47       The jury could have determined Defendant inflicted these serious personal

injuries on B.J. to overcome her resistance to being raped and that he had committed the second-degree sexual offense, by forcing his penis into her mouth. Sufficient evidence supports the jury's determination Defendant's infliction of personal injuries on B.J. were all done by Defendant in order to forcibly rape her.

¶ 48    Even if the verdicts are inconsistent, they are not contradictory verdicts barred by our Supreme Court's ruling in *Mumford.* 364 N.C. at 399, 699 S.E.2d at 915. *Mumford* declares that jury verdicts may be influenced by many factors. *Id.*

> [I]nconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

*Id.* at 399, 699 S.E.2d at 915.

¶ 49    Our Supreme Court held, "[t]hat the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible . . . . verdicts cannot be upset by speculation or inquiry into such matters." *Id.* (citation omitted). "[I]f the inconsistent verdicts are determined to be merely inconsistent, rather than mutually exclusive, then the verdicts will stand so long as the State has presented substantial evidence as to each element of the charges." *Blackmon,* 208 N.C. App. at 403, 702 S.E.2d at 838 (citation omitted).

¶ 50    "Verdicts are mutually exclusive when a verdict purports to establish that the [defendant] is guilty of two separate and distinct criminal offenses, the nature of which is such that guilt of one necessarily excludes guilt of the other." *Mumford*, 364 N.C. at 400, 699 S.E.2d at 915 (citation and internal quotation marks omitted).

¶ 51    Here, the jury reached their conclusion on the first-degree forcible rape and rendered a verdict of guilty of second-degree sexual offense. The jury's verdict could also be a demonstration of "lenity" towards Defendant and, the verdict should not be disturbed. *Id.* at 399, 699 S.E.2d at 915.

¶ 52    These crimes are not mutually exclusive because guilt of one criminal act does not exclude guilt of the other. Sufficient evidence supports the guilty verdicts by the jury. Defendant has failed to show any prejudicial error and is not entitled to a new trial.

¶ 53    "If Defendant required greater specificity, he could have moved for a bill of particulars under N.C. Gen. Stat. § 15A-925 (2019) and/or for a special verdict sheet under N.C. Gen. Stat. § 15A-1340.16 (2019)." *State v. Flow*, __ N.C. App. __, __, 2021-NCCOA-183 ¶ 70, __ S.E.2d __, __ (2021).

## VII.    Conclusion

¶ 54    The evidence presented at trial supports each conviction under N.C. Gen. Stat. § 14-27.21 and a lesser-included offense under § 14-27.27. Defendant's actions, resulting in the two distinct charges, are not inconsistent and mutually exclusive.

STATE v. BRAKE

2021-NCCOA-496

*Opinion of the Court*

Defendant received a fair trial, free from prejudicial errors he preserved and argued.

We find no error in the jury's verdicts or in the judgments entered thereon. *It is so ordered.*

NO ERROR.

Judges CARPENTER and GRIFFIN concur.